**Emil J. HOLZ, Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. No. 5720.**

United States District Court
D. Minnesota,
Fourth Division.

May 14, 1959.

Ward B. Lewis and Archibald Spencer, Minneapolis, Minn., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner and Jerome S. Hertz, Attorneys, Department of Justice, Washington, D. C., and Fallon Kelly, U. S. Atty., St. Paul, Minn., for the United States of America.

NORDBYE, Chief Judge.

This proceeding is an action seeking a refund of income taxes and interest paid to the Government in the sum of $33,446.-67. The record consists of a stipulation of facts and the testimony of plaintiff. The taxes in question were paid pursuant to the assessment of the District Director of Internal Revenue with respect to certain transactions which took place in the year 1947 and which the Director claimed constituted a dividend to plaintiff and hence was taxable at ordinary tax rates. It is plaintiff's position that the transaction was a corporate reorganization and therefore the stock he received in the reorganization was not taxable. The facts which are not in dispute may be recited as follows.

In 1947 plaintiff was the President, chief stockholder, and active manager of two concerns known as the Winona Motor Company and Winona Truck and Implement Company, hereafter referred to as the Motor Company and the Truck Company. The other stockholders were Leonard N. Kohner, who devoted part of his time to the business of these two concerns, and the wives of Holz and Kohner. Holz, however, carried the burden of active management of the two concerns.

The corporations owned certain real estate which had a net book value of $71,484.96, $40,762.97 in the Motor Company and $30,721.99 in the Truck Company.

In the spring of 1947, plaintiff was suffering from a heart condition which caused his physician to advise him strongly to divest himself of the business load which he was carrying or his life span would be materially shortened. Thereupon, plaintiff attempted to obtain a buyer or buyers for the Motor Company, but learned that prospective buyers were reluctant to purchase it, as well as the Truck Company, because of the substantial amounts of real estate owned by the concerns, and automobile men interested in taking over the concerns, together with the franchises, were hesitant to invest their money in companies holding so much real estate with the result that their working capital would not be sufficiently liquid. Moreover, the automobile companies supplying the Motor Company with Buick and Chevrolet cars were likewise reluctant to assign their franchises to another dealer if he assumed the burden of taking over a substantial amount of real estate in the transaction.

Confronted with this situation, Holz consulted with his counsel and a public accountant, and a third corporation was set up called the Holz-Kohner Realty Company, hereafter called the Realty Company, to which would be deeded the real estate of both corporations. In carrying out this plan, plaintiff was to receive 155.5 shares of the stock in the Realty Company, Kohner, 93.5 shares, and H. K. Brehmer, their attorney, one share. The Realty Company was to assume the liabilities and liens against the real estate and pay the Motor and Truck companies the net value over and above these encumbrances. The payment for the real estate over and above the encumbrances, according to the first minutes of the shareholders of the Realty Company as of August 28, 1947, was to be made "either in cash or by offset credits to the Winona Motor Company and Winona Truck and Implement Company, which offset credits can be used to pay for the real estate proposed to be purchased from the two said companies." No cash entered into the transaction. It is to be gathered that Holz, as well as Kohner, entertained the belief that as stockholders they had an interest in the surplus accounts of these two corporations, and that according to the amount of their respective holdings, they could utilize such accounts for the payment of the real estate which the Realty Company was to purchase. This is evidenced by identical letters, except for the amounts involved, written by Holz as President of the Realty Company to the Truck and Motor companies. The letter to the Motor Company reads as follows:

"October 1, 1947

"Winona Motor Company
Winona, Minnesota

"Gentlemen:

"We have been advised by E. J. Holz that he will have a credit on your books in the sum of $25,516.27 when the sale of the real estate which we are purchasing from you is consummated.

"We have also been advised by L. N. Kohner that he will have a credit on your books in the sum of $15,246.70 when the sale of the real estate which we are purchasing from you is consummated.

"Both E. J. Holz and L. N. Kohner have advised us that they have directed you to apply the above credits to our account to pay in full the purchase price of the real estate which we are purchasing from you. We therefore request you to apply the credits above mentioned due E. J. Holz and L. N. Kohner from you totaling $40,762.97 in full payment of the purchase price of the real estate which we are purchasing from you, and request that you deliver the deed covering said property to us.

"Yours truly,

Holz-Kohner Realty Company
by
E. J. Holz, President"

On the same date, Holz and Kohner wrote identical letters, except for the

amounts involved, which letter on behalf of E. J. Holz reads:

"Holz-Kohner Realty Company
Winona, Minnesota

"Gentlemen:

"When you complete the purchase from the Winona Motor Company of the real estate owned by them there will be due me from the Winona Motor Company the sum of $25,516.27.

"When you complete the purchase from the Winona Truck and Implement Company of the real estate now owned by them there will be due me from the Winona Truck and Implement Company the sum of $19,232.00.

"I have directed both the Winona Motor Company and the Winona Truck and Implement Company to credit the above mentioned amounts to your account to be applied on the purchase price of the real estate which you are purchasing from each of said companies. This will result in a credit due me from you in the sum of $44,748.27 which I direct you to apply on the purchase price of the 155.5 shares of your stock which I have subscribed for and the one share of stock which H. K. Brehmer subscribed for.

"When the purchase of the real estate from the Winona Motor Company and the Winona Truck and Implement Company has been completed, please issue the 155.5 shares of your stock to me in the name of E. J. Holz, and the one share of your stock to H. K. Brehmer.

"Yours very truly,
E. J. Holz"

At the special meeting of the Board of Directors of the Winona Motor Company on September 30, 1947, in referring to the sale of the real estate to the Realty Company, the following resolution was adopted:

"Be It Further Resolved that when the proceeds of the sale of said real estate above described is received that the same be credited to the surplus account and the capital of the corporation be reduced by the amount received, namely $40,762.97 and that said surplus then be distributed to the stockholders of the corporation by crediting the individual accounts of the stockholders as follows:

| | |
|---|---|
| E. J. Holz | the sum of $24,568.27 |
| Ruby Holz | the sum of 948.00 |
| Leonard N. Kohner | the sum of 14,298.70 |
| Margaret K. Kohner | the sum of 948.00 |

and said sums to be subject to withdrawal by said stockholders at any time."

An identical resolution is to be found in the minutes of the Truck Company as of the same date, except for the amounts involved.

The wives assigned their stockholdings in the Motor Company and the Truck Company to their husbands, so the only stockholders concerned in the transactions were Holz and Kohner, except for the one share held by Mr. Brehmer. In accordance with the resolutions of the respective Boards and the letters written

by the stockholders, the real estate of the Truck Company and the Motor Company as of October 1, 1947, was transferred to the Realty Company and offsetting credits in payment thereof were made on the books of the transferors. On the Motor Company books, a credit of $40,762.07 was entered and charged to an account designated as "Donated Surplus". On the Truck Company books, the capital stock account was charged in the sum of $30,721.99. No explanation is forthcoming for the utilization of the donated surplus account as a book item to effect the consideration for the transfer of the

Motor Company's real estate. It appears, however, that this account came into being by reason of prior surrender of the company's stock by former stockholders which was thereafter sold, cash donations to the company, and the cancellation of a note and mortgage without consideration. The stock of both the Motor Company and the Truck Company was no par stock.

The parties have stipulated that neither the Motor nor the Truck Company had paid any dividends prior to October 1, 1947. Holz was drawing a salary of about $1,000 a month from the Motor Company. Apparently he drew no salary from the Truck Company. The capital stock account of the Truck Company represented the original contribution to capital of the corporation on its formation. It was organized as of January 2, 1946, to carry on a business that theretofore had been conducted by Holz and Kohner as partners. Among the assets, in addition to the truck franchise, was the real estate which was transferred to the Realty Company. The gross sales of the Motor Company in 1947 were approximately $700,-000, and for the Truck Company during that year approximately $300,000. The earnings and profits of the Motor Company for federal income tax purposes were on October 1, 1947, in excess of $40,762.97, the value of the real estate transferred by that company, and as to the Truck Company, the earnings and profits for federal income tax purposes were on October 1, 1947, in excess of $30,721.99, the net value of the real estate transferred by that company. Further, it appears that early in 1948 the stock interest of Kohner in the Truck Company and the Realty Company was redeemed and Holz became the sole shareholder thereof. Some time during 1949 and 1950, Holz disposed of his stock in the Motor Company to one Roy Evett, who continued the business of that company. Kohner's stock in the Motor Company was likewise disposed of at or about this time. However, plaintiff was not able to sell the Truck Company until 1955. At that time he disposed of the International truck franchise and also sold the

implements and parts on hand. Later, the Truck Company was merged with a company formed by plaintiff in 1955 and known as the Valley Distributing Company. The Valley Company was a retail and wholesale farm supply and distributing company. In 1956, the Realty Company was merged with the Valley Company. The business of the Valley Company now consists of the managing of the real estate assets formerly owned by the Realty Company, and in addition it sells farm supplies and miscellaneous goods. The Valley Company has but five employees. Its gross sales for the ten month period ending October 31, 1957, were $212,819. Plaintiff is the general manager of the Valley Company.

At the threshold of this controversy, we are met with the question as to whether the stock which plaintiff received in the Realty Company constituted a constructive dividend from the Motor and Truck companies, and hence was taxable under the federal income tax laws. It seems clear that an analysis of the admitted facts requires an affirmative answer to that question. Prior to the transactions here involved, plaintiff held an indivisible interest in the earnings and profits of these two companies. The earnings and profits which had accumulated exceeded the value of the real estate which was transferred to the Realty Company. After the transaction was completed, Holz became the possesser of individual property rights in the capital stock of the Realty Company having a market value, according to the stipulation of the parties, of $44,478.27. Obviously, these property rights were materially different from the contingent interest he theretofore held as a stockholder in the Motor and Truck companies. As the result of these transactions, he became the dominant stockholder in a company that leased the real estate to the transferors. In other words, the Realty Company became the lessor and the Motor and Truck companies became the lessees of the real estate in question. The real estate consisted of the buildings and area which housed the activities of the Motor and

Truck companies. Apparently part of the real estate was vacant and such areas were used in common by both companies.

Not only is the Government's position sustained as to Holz' receipt of constructive dividends from these two companies within the teachings of United States v. Phellis, 257 U.S. 156, 42 S.Ct. 63, 66 L.Ed. 180, and Rockefeller v. United States, 257 U.S. 176, 42 S.Ct. 68, 66 L.Ed. 186, but also by the recitals in the provisions of 26 U.S.C., 1952 ed., Section 115 (a) and (b), as follows:

"(a) [as amended by Sec. 166 of the Revenue Act of 1942, c. 619, 56 Stat. 798] *Definition of Dividend.*— The term 'dividend' when used in this chapter (except in section 201 (c)(5), section 204(c)(11) and section 207(a)(2) and (b)(3) (where the reference is to dividends of insurance companies paid to policy holders)) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year * * *.

* * * * * *

"(b) *Source of distributions.* For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. * * *"

Plaintiff apparently recognizes that, in view of the distribution of the accumulated earnings and profits of the two companies, he was the beneficiary of constructive dividends equaling the value of the real estate and that the only issues between the parties here are: (1) Did an exchange take place within the meaning of Section 112(b)(3) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 112 (b)(3), and (2) did plaintiff have a valid business purpose in causing the reorganization to come about?

We commence, therefore, with the premise that unless plaintiff has sustained the burden of proof as to these two propositions, it must follow that he is not entitled to any tax exemption. The two questions will be considered in reverse order.

It is the Government's position that the transaction here cannot be classed as a reorganization within the meaning of the statute in that that which was done was not germane to the conduct of the business of the Motor and Truck companies. The Government recognizes, however, that these transactions were in no way tainted with sham or devised for any devious purpose. It recognizes that Holz believed his health to be in a precarious condition and in order to relieve himself of the burden of managing the two concerns with the resulting heavy business responsibilities, he conceived this plan in good faith so as to be in a better position to obtain buyers for the Motor and Truck companies. However, the Government emphasizes the fact that Holz did not intend to be active in either business after a purchaser was found, and hence it is urged that these transactions were not devised for the purpose of enabling the present stockholders to continue as owners of any stock in either the Truck or Motor Company. In other words, it is the Government's position that the entire transaction was but a step in a plan for Holz, as well as Kohner, to bow out of the motor and truck business. However, the plan did propose the continuance of the Motor and Truck companies as legal entities with the view that the new owners of the capital stock would continue these businesses. It would seem that the term "reorganization" as set forth in the statute should not be construed narrowly if the end result as contemplated by the statute is achieved. Riddlesbarger v. Commissioner, 7 Cir., 200 F.2d 165. The definition of "reorganization" as set forth in Section 112 (g) of the Revenue Act of 1939 reads:

"(1) The term 'reorganization' means * * * (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the

the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *."

Here, the stockholders of the transferors admittedly were in control of the three corporations after the real estate was transferred. Holz owned 68 per cent of the stock of the three corporations and Kohner 32 per cent. The Court cannot say that, under these circumstances, no business purpose of any kind existed. It is true that there was no business identity between the new and the old corporations except that the Realty Company became the lessor of the real estate it acquired and the Motor Company and Truck Company became the lessees. But the end result as to stock ownership conforms with the requirements of Section 112(g). The factual situation in Helvering v. Gregory, 2 Cir., 69 F.2d 809; Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, is readily distinguishable and furnishes the Government no support here for its contention that this transaction did not constitute a reorganization within the purview of the applicable statute.

■ However, if the Court is sound in finding that the transaction in question constituted a reorganization within the meaning of the statute, a more difficult question arises as to whether or not this was a tax-free reorganization. In discussing this problem, it does not seem necessary to enter into any detailed discussion of the terms "spin-off", "split-off" and "split-up", as these terms have been used by textwriters and in the Internal Revenue Department itself. Suffice it to say that a "spin-off" exists where Corporation A organizes a subsidiary, Corporation B, to which is transferred part of A's assets in exchange for all of the capital stock of Corporation B. The stock of Corporation B is transferred to A shareholders without the surrender of their stock in A. If the distribution of the stock to A shareholders constitutes a dividend, then it is a taxable one. Between the years 1934 and 1951, "spin-offs" did not meet the requirements of

Section 112(b)(3) in that there was no exchange of stock for stock under such a plan. Chester E. Spangler, 18 T.C. 976, 988. Apparently the objection to allowing "spin-offs" as tax free transactions stems from the fact that under that method a reorganization could be employed as a vehicle whereby stockholders could separate their gains from their stock investments and thereby enable them to have their accumulated gains computed at capital gain tax rates rather than at ordinary income tax rates. That in enacting Section 112(b)(3) Congress intended to withdraw the exemption from taxable gains in reorganization where there had not been an exchange of stock at the stockholders' level, seems clear and unmistakable. The statute requires that there be an exchange of stock for stock if no gain or loss is to be recognized. Section 112 reads:

"Recognition of gain or loss.

"(a) *General rule.*—Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized except as hereinafter provided in this section.

"(b) *Exchanges solely in kind.*

\* \* \* \* \* \*

"(3) *Stock for stock on reorganization.* No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

■ In the instant situation, no stock of the Motor Company or the Truck Company was exchanged for stock in the Realty Company. After the reorganization, Holz held the same stock certificates in the same amount in the Motor and Truck companies as before the transaction was initiated. There was no surrender, cancellation or alteration of any stock certificates of the Motor and Truck companies owned by Holz or Kohner as part of the reorganization. In the case

of the Motor Company, the book entry was to charge the donated surplus account and no book entries were made whatsoever with respect to the capital account of that company. In the case of the Truck Company, the capital account to the extent of the value of the real estate was charged. It is urged by plaintiff that the stock being no par stock, the reduction in its value would necessarily ensue to the extent of the value of the real estate transferred. But when dividends are declared and paid to stockholders from savings or profits in the usual manner, with or without a reorganization, to the extent of a substantial portion of the value of the aggregate assets, there can be no doubt that such dividend payments would be reflected in a diminution of the value of the no par stock.

Plaintiff relies on Menefee v. Commissioner, 46 B.T.A. 865, and Fry v. Commissioner, 5 T.C. 1058. However, the facts in these cases as to the exchange of stock in compliance with Section 112 (b)(3) are materially different from the plan which was adopted and followed here. In the Menefee case, there was an "exchange of stock" in full and strict compliance with the statute. In the Fry case, the shareholders of the transferor corporation physically presented their shares whereby they could be stamped as having a lesser par value than that reflected in the original stock certificates. Moreover, appropriate resolutions were adopted to reduce the authorized capital in the transferor and the charter was amended accordingly. The formalities followed in these two cases leave no real doubt as to the sufficiency of the compliance with the mandate of the statute in question.

Plaintiff urges very seriously that this Court should not be bound by what he terms to be the "ritualistic formula" which the Government seeks to maintain in the construction of this statute. Rather, he contends the Court should look to the substance instead of the form. However, when Congress uses explicit language in a statute stating the requirements which must be fulfilled in order to exempt dividends from tax liability, the Court should not attempt by interpretation to broaden the statute beyond the apparent Congressional intent.

Reference may be made to the report of the House Committee in connection with the Revenue Act of 1924. It was under that Act that gains in "spin-offs" were first declared to be free from income tax liability. The report (H.Rep. No. 179, 68th Cong., 1st Sess., p. 14 (1939–1 Cum.Bull. (Part 2) 241, 251)) reads:

"Section 203 (c): There is no provision of the existing law which corresponds to subdivision (c). Under the existing law, if Corporation A organizes a subsidiary, Corporation B, to which it transfers part of its assets in exchange for all the stock of Corporation B, and distributes the stock of Corporation B as a dividend to its stockholders without the surrender by the stockholders of any of their stock, then such dividend is a taxable one. If, however, Corporation A organizes two new corporations, Corporations B and C, and transfers part of its assets to Corporation B and part to Corporation C, and the stockholders of Corporation A surrender their stock and receive in exchange therefor stock of Corporations B and C, no gain from the transaction is recognized. Thus, under the existing law, the same result, except as to tax liability, may be obtained by either of two methods; but if the first method set out above is adopted, there is taxable gain. Subdivision (c) of the bill permits the reorganization to be accomplished in the first manner set out above without the recognition of gain."

The existing law which the Committee Report described was substantially the same as Section 112(b)(3) of the 1939 Code.

Plaintiff is seeking here to rely upon the terms of a statute which afford him exemption from having constructive

dividends declared taxable. The burden rests upon him to establish that he has fulfilled the requirements of the exemption statute. In that the statute outlines the specific steps to be taken in the reorganization of a corporation in order to entitle shareholders to have dividends they receive in such transactions exempted from ordinary tax liability, the Court has no alternative but to require strict compliance with the terms of the exemption statute. The book entries made here cannot be translated into the type of an exchange of stock for stock which necessarily was contemplated by the statute. Indeed, one cannot spell out an exchange of stock for stock when the stockholders, after receiving their dividends, retained the identical stock in the corporations which declared the dividends.

Findings of fact and conclusions of law consistent herewith may be presented by the defendant upon ten days' notice.