H. GRADY LESTER, JR., AND ANNE LEE LESTER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 93547.   Filed September 12, 1963.

*Michel G. Emmanuel* and *Norman H. Lipoff*, for the petitioners.
*Kenneth G. Anderson*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioners' income tax for the calendar year 1958 in the amount of $25,475.16.

The only issue is whether petitioner Anne Lee Lester (who will hereafter be referred to as petitioner) realized taxable income in the amount of $50,000 by reason of her receipt in 1958 of 500 shares of stock of Automotive Warehouse Co., Inc. (hereafter called Warehouse), in a reorganization of General Auto Supply Co. (hereafter called General Auto).

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners are husband and wife who resided in Tampa, Fla., in 1958. They filed a joint Federal income tax return for that year with the district director of internal revenue, Jacksonville, Fla.

General Auto is a Florida corporation incorporated in 1938 to conduct a business which previously had been operated as a sole proprietorship. Its principal office in 1958 was in Tampa, Fla.

During 1958 the authorized capital stock of General Auto was 8,000 shares of common stock of which the 6,000 shares issued and outstanding were owned as follows:

| Stockholder | Number of shares |
|---|---|
| Jannie J. Dunn (widow of E. A. Dunn, Sr.) | 2,640 |
| Petitioner (daughter of E. A. Dunn, Sr.) | 1,050 |
| E. A. Dunn, Jr. | 1,050 |
| Mary Harman Dunn (daughter of E. A. Dunn, Jr.) | 60 |
| Billie Dunn (daughter of E. A. Dunn, Jr.) | 60 |
| Jannie Dunn (daughter of E. A. Dunn, Jr.) | 60 |
| Cornelia Anne Lester (daughter of petitioners) | 90 |
| Grady E. Lester (son of petitioners) | 90 |
| Estate of E. A. Dunn, Sr. | 900 |
| Total | 6,000 |

Petitioner H. Grady Lester, Jr. (hereafter called Lester), went to work for General Auto in 1946 as manager of welding supply sales. He became a director in 1950 and an officer of the corporation in 1951. He was vice president and a director of General Auto in 1958.

At all times material hereto General Auto was engaged in the business of selling automotive parts, supplies, and related items. Prior to 1958 it acted both as a warehouse distributor and as a jobber. In the automotive parts business a warehouse distributor is one who buys from the manufacturer and sells to jobbers. A jobber buys from a warehouse distributor or the manufacturer and sells to dealers such as garages, service stations, and retail outlets. The principal service which the warehouse distributor renders is to carry a large stock of inventory on hand locally which is readily available to the jobber in filling his orders. As compensation for performing this service, the manufacturer sells to the warehouse distributor at a lower price than to the jobber, or in some cases allows the warehouse distributor a commission on sales to jobbers.

In 1946 and later years General Auto also sold welding supplies. In 1953 it was decided to form a separate corporation to sell welding supplies since the purchasers of such supplies were accustomed to buying from industrial supply houses rather than suppliers of automobile parts, and many industrial users who bought welding supplies felt that they could buy these supplies more cheaply from a regular industrial supplier. An industrial supplier could handle more lines and get better discounts than could General Auto. General Welding Supply Co. (hereafter

called Welding) was organized and incorporated in 1953 to take over the welding supply business. General Auto transferred $80,000 cash to Welding and all of the shares of stock of Welding were issued to the stockholders of General Auto in proportion to their stockholdings in General Auto. The $80,000 transferred to Welding was used to purchase the welding supply inventory of General Auto. After its formation Welding was highly successful. Lester became vice president and general manager of Welding upon its incorporation on November 30, 1953.

After 1946 General Auto's sales of automobile parts and supplies to jobbers increased. This warehouse distribution activity grew with the increase in the number of jobbers in the Florida area, and the growth of sales volume in this activity was pronounced between 1946 and 1958. But the jobbers, who bought from General Auto as a warehouse distributor and sold to dealers, did not like doing business with a competitor, which General Auto in its function as a jobber was to them, and some of the suppliers of General Auto did not approve of selling it automobile parts at two different prices, one to General Auto as a warehouse distributor and another to it as a jobber. Also, if parts were shipped from manufacturers in cartons with "General Auto" stenciled on them and the cartons were used to ship parts to jobbers, customers of the jobbers sometimes became aware of the name and got the impression that they could buy directly from General Auto, which they knew to be a jobber, at their jobber's price and save his markup. The jobbers' complaints about the dual function of General Auto were discussed with increased frequency by Lester and the general manager of General Auto, and in 1947 or 1948 General Auto, after being advised by counsel that the formality of separate incorporation was not necessary to do so, began using the name "Automotive Warehouse Company" for its warehouse distribution activity, and that name was thereafter used by manufacturers for billing and shipping to General Auto. However, the jobbers' resistance to General Auto acting in the dual capacity continued.

About 1955 some manufacturers were becoming increasingly concerned with the possibility of violation of the Robinson-Patman Act involved in selling at one price to a customer who was strictly a jobber and at a lower price to a customer who was both a distributor and a jobber. Decisions by the Federal Trade Commission in that year regarding such a practice had made the problem more

acute. In one case it was ruled that a manufacturer, with whom General Auto dealt, was discriminating in prices by selling at one price to a jobber who sold only to dealers and at another price, which took into account a special warehouse discount, to jobbers who performed redistribution functions. To explain this ruling and its effect, the manufacturer involved wrote General Auto on June 3, 1955, and stated:

> Naturally, the rulings handed down by the F.T.C. recently, have caused you and other firms in your position concern, and many jobbers who are now selling both to Dealers and to other Wholesalers are giving serious consideration in divorcing their redistribution business entirely from their dealer business and operating their warehouse as a separate entity.

Other manufacturers also wrote General Auto about the effect of the ruling and in a letter from one of these it was predicted that all concerns such as General Auto would come to forming separately operated corporations in order to justify a manufacturer's price less than that quoted to jobbers.

As a result of the above and other factors the management of General Auto gave increasing consideration to transferring the warehouse distribution activity to a separate corporation, and in 1955 a search was begun to find a suitable piece of land on which to build a new warehouse. Property was acquired for this purpose by Brookline, Inc., a corporation formed by the stockholders of General Auto, in February 1957.

On November 6, 1957, a certificate of incorporation for Warehouse was filed in the office of the secretary of state of Florida. It listed three subscribers for the stock of the corporation, being the two petitioners and Mary H. Dunn, each of whom was shown as subscribing for 10 shares. These individuals subscribed for these qualifying shares because they had been advised by counsel that under State law a corporation such as General Auto could not be an incorporator. The first directors of Warehouse were Jannie J. Dunn, Edwin A. Dunn, Jr., Mary H. Dunn, J. L. Stevens, H. S. Costan, and petitioners. Warehouse was inactive until March 24, 1958.

At meetings held on March 24, 1958, the stockholders and directors of both Warehouse and General Auto adopted and approved a "Plan of Reorganization" which provided:

> 1. On or about March 31, 1958, GENERAL AUTO SUPPLY CO. shall transfer to AUTOMOTIVE WAREHOUSE CO., INC. the sum of Two Hundred Thousand Dollars ($200,000.00) in cash.
>
> 2. In return for said transfer of cash, AUTOMOTIVE WAREHOUSE CO., INC. shall, at the direction of GENERAL AUTO SUPPLY CO., issue two thousand (2,000) shares of its One Hundred Dollar ($100.00) par value common stock to the shareholders of GENERAL AUTO SUPPLY CO., pro rata, as follows:

| | *Shares* |
|---|---|
| Jannie J. Dunn | 880 |
| Anne Lee Dunn Lester | 350 |
| Edwin A. Dunn, Jr | 350 |
| Edwin A. Dunn, Jr., as custodian for Mary Harman Dunn, a minor, under the Florida Gifts to Minors Act | 20 |
| Edwin A. Dunn, Jr., as custodian for Billie Dunn, a minor, under the Florida Gifts to Minors Act | 20 |
| Edwin A. Dunn, Jr., as custodian for Jannie Dunn, a minor, under the Florida Gifts to Minors Act | 20 |
| Anne Lee Dunn Lester, as custodian for Cornelia Anne Lester, a minor, under the Florida Gifts to Minors Act | 30 |
| Anne Lee Dunn Lester, as custodian for Grady Edwin Lester, a minor, under the Florida Gifts to Minors Act | 30 |
| Estate of Edwin A. Dunn, Sr | 300 |
| Total | 2,000 |

3. The AUTOMOTIVE WAREHOUSE CO., INC. shall purchase from GENERAL AUTO SUPPLY CO. sufficient inventory of automotive parts and supplies to engage in the business of selling automotive supplies and parts to jobbers. The purchase price shall be the book value of said parts and supplies, and the consideration shall be paid in cash and corporate promissory notes.

4. Upon the purchase of the automotive parts and supplies inventory, the GENERAL AUTO SUPPLY CO. shall immediately cause the said property to be removed from its premises, and shall thence forth cease to engage in the sale of automotive parts and supplies to jobbers.

5. This plan of reorganization shall be consummated on or before April 30, 1958.

6. This plan is intended to result in a "spin-off" reorganization without the recognition of any gain or loss to either Corporation or to their respective Stockholders, in accordance with the provisions of Section 355 of the 1954 Internal Revenue Code.

At the same meeting of the board of directors of Warehouse the officers of the corporation were authorized to enter into a 5-year lease on the property acquired by Brookline, Inc., upon which a warehouse had then been built. As of April 1, 1958, General Auto transferred $200,000 to Warehouse and about $140,000 of this sum was used to purchase inventory at book value from General Auto. Warehouse thereupon began the business of selling automotive parts and supplies to jobbers in the leased premises about 2 miles from those of General Auto, and General Auto ceased the warehouse distribution activity.

Upon the advice of the accountants retained by General Auto the sum of $200,000 was transferred to Warehouse, rather than inventory, in order to minimize the possibility of disallowance of a surtax exemption under section 1551, I.R.C. 1954. The shares of stock of Warehouse were issued directly to the stockholders of General Auto,

rather than to General Auto for distribution to its stockholders, in order to save the costs of Federal and State excise taxes on a second transfer of the shares.

The reconciliation of taxable income and analysis of earned surplus and undivided profits of General Auto, as shown on its Federal income tax returns for its taxable years ended March 31, 1958 and 1959, were as follows:

|  | Mar. 31, 1958 | Mar. 31, 1959 |
|---|---|---|
| Earned surplus and undivided profits at end of preceding taxable year | $189,401.84 | $215,622.24 |
| Taxable income before net operating loss deduction and special deductions (credit) | 68,334.17 | 28,350.53 |
| Reserve for cylinder deposits (credit) | 25.00 | 790.50 |
| Increase in life insurance value (credit) | 93.00 | 143.15 |
| Total distribution to stockholders charged to earned surplus during the taxable year— | | |
| Cash (debit) | 12,000.00 | _____ |
| Other property (debit) | _____ | 200,000.00 |
| Federal income and excess profits taxes (debit) | 30,033.77 | 8,194.16 |
| Other unallowable deductions (debit) | 198.00 | 198.00 |
| Earned surplus and undivided profits at end of the taxable year | 215,622.24 | 36,514.26 |

For its taxable year ended March 31, 1958, General Auto reported gross sales (less allowances) of $1,249,049.25, and for its taxable year ended March 31, 1959, it reported gross sales (less allowances) of $471,677.14.

Warehouse filed a Federal corporation income tax return for the taxable period April 1, 1958, to January 31, 1959, reporting gross sales (less allowances) of $850,850.93, and taxable income of $15,675. It reported no beginning earned surplus and undivided profits. On the books of Warehouse its capital, represented by common stock, was shown as $200,000.

During the 10-year period prior to April 1, 1958, General Auto paid dividends as follows:

| Fiscal year ended March 31— | Cash dividends | Stock dividends |
|---|---|---|
| 1949 | $15,000 | [1] $33,507.29 |
| 1950 | 14,000 | _____ |
| 1951 | 12,700 | [1] 50,000.00 |
| 1952 | 17,520 | _____ |
| 1953 | 18,540 | _____ |
| 1954 | 20,040 | [2] 80,000.00 |
| 1955 | 8,040 | _____ |
| 1956 | 12,000 | _____ |
| 1957 | 12,000 | _____ |
| 1958 | 12,000 | _____ |
|  | 141,840 | 163,507.29 |

[1] Stock of General Auto.
[2] Stock of Welding.

From 1946 to the formation of Welding, General Auto occupied a one-story warehouse building in Tampa owned by one of the stockholders. In this building were located the general business offices, a machine shop for rebuilding motors, etc., a counter where orders from any source were received and filled (until about 1951 when it was arranged to have jobbers' orders picked up in the shipping department), a shipping and receiving area, and the warehouse itself which contained the entire inventory of General Auto, including automotive parts and supplies sold to both jobbers and dealers, and welding supplies. After the formation of Welding the welding supply business and inventory was moved to another location some distance from the place of business of General Auto.

Prior to March 31, 1958, the activities of General Auto were carried on by its management and bookkeeping staff, its shipping and receiving department, its counter department, its delivery personnel, and its sales force. General Auto had one general manager who directed the overall business operations of the corporation. The bookkeeping, accounting, and clerical staff were supervised by the assistant secretary-treasurer of the company. In maintaining the books and records of General Auto only one overall set of books and records were kept for the company's entire operations. Separate books and records were not maintained for the distribution and the jobbing activities. However, for many years prior to 1958 the general manager and the assistant secretary-treasurer kept records of the calls of salesmen to jobbers, gross sales to jobbers, and expenses roughly allocable to their work, not only to compute the salesmen's commissions but also the approximate profit being earned by the warehouse distribution activity and the ratio of the sales to jobbers to total gross sales. Exemplary of such records were those few still available and produced at the trial which show sales to jobbers in May 1951 to be 23.6 percent of all sales (excluding welding supply sales); in June 1951, 28.8 percent; in July 1955, 53.5 percent; in July 1956, 58.3 percent. Records from July 1951 to July 1955 were no longer available.

Personnel at the counter and in the shipping and receiving department made no distinction in the performance of their duties, except as above noted, as between the distribution and jobbing activities, and the inventory of automotive parts and supplies was not segregated according to these activities.

After 1946 General Auto had at least one salesman who sold exclusively to jobbers, although other salesmen sold to both jobbers and dealers. The commission paid a salesman for sales to jobbers was 3–3½ percent while that paid on sales to dealers was 6–7

percent. Beginning in 1952 General Auto employed one man whose job it was to buy for the warehouse activity. While deliveries were sometimes made to both jobbers and dealers in the same trucks and by the same personnel, deliveries to jobbers were made only twice a week rather than every day as they were made to dealers, and the jobber-salesman had a station wagon in which he often made deliveries to jobbers.

In addition to the 350 shares of stock of Warehouse received by petitioner pursuant to the "Plan of Reorganization" she received 150 shares in 1958 by distribution from the estate of Edwin A. Dunn, Sr.

## OPINION

The only issue is whether petitioner realized taxable income in the amount of $50,000 upon the receipt by her of 500 shares of stock in Warehouse (in a divisive reorganization of General Auto), or whether the provisions of section 355 of the Code [1] apply to provide nonrecognition of gain. Respondent determined that the distribution of the Warehouse stock, having a value of $50,000, by General Auto to its stockholders was a taxable dividend to the stockholders. Petitioners do not controvert the value placed upon the 500 shares and, although petitioner received 150 of the 500 shares by distribution from the estate of Edwin A. Dunn, Sr., the parties agree that in the resolution of the instant case these 150 shares are to be treated as if received by petitioner as a stockholder of General Auto.

Sections 301 and 316 provide that any distribution of property by a corporation to its stockholders out of its earnings and profits shall be taxable to the stockholders as a dividend to the extent of the fair market value thereof, except as otherwise provided. It seems clear that the stock of Warehouse received by petitioner should be considered as having been distributed to her by General Auto for purposes of the statute, despite the fact that they were issued to her directly by Warehouse, and that the receipt of the stock would be governed by section 301 as a distribution by General Auto to its stockholders, see *Holz* v. *United States*, 176 F. Supp. 330 (D. Minn. 1959), unless the transaction falls within one of the exceptions otherwise provided. While respondent, in his argument on another point, attempts to fragmentize the transaction, we have no doubt that under the plan adopted by both corporations, General Auto became the beneficial owner of the stock of Warehouse and caused it to be distributed to its stockholders pro rata; [2]

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise noted.

[2] General Auto's accountant testified that the Warehouse stock was issued directly to the stockholders of General Auto to avoid a double transfer tax.

and respondent's treatment of the distribution as a dividend from General Auto appears to recognize this.

Petitioners contend that the transaction falls squarely within the provisions of section 355, the pertinent provisions of which are set forth in the margin,[3] and consequently that no gain shall be recognized to petitioner on the receipt of the stock. Respondent contends that section 355 is inapplicable because: (1) The division here was of a single business, and section 355 does not apply to the division of a single business, (2) the active business requirements of section 355 have not been met, and (3) the distribution was primarily a device for the distribution of the earnings and profits of General Auto. Respondent, acknowledging that we have held that section 355 does apply to the division of a single business in *Edmund P. Coady*, 33 T.C. 771 (1960), affirmed per curiam 289 F. 2d 490 (C.A. 6, 1961), asks us to reexamine our conclusion in that case. Petitioners contend primarily that General Auto conducted two separate businesses before the spinoff, one as a warehouse distributor and the other as a jobber, and rely on *Coady* only if we decide against their primary contention.

Without question it was intended that the organization of Warehouse, the transfer of $200,000 to Warehouse by General Auto, the purchase of the warehouse distribution assets by Warehouse from General Auto, and the receipt of Warehouse shares by the stockholders of General Auto be a part of a corporate separation prescribed by section 355; the issue is squarely whether the intended result was achieved.

---

[3] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(a) EFFECT ON DISTRIBUTEES.—

(1) GENERAL RULE.—If—

(A) a corporation (referred to in this section as the "distributing corporation")—

(i) distributes to a shareholder, with respect to its stock, * * *

\*         \*         \*         \*         \*         \*         \*

solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or

(ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,

As stated in *Edmund P. Coady, supra* at 775–776:

In general, section 355(a) prescribes the form in which a qualifying transaction must be cast, providing that a divisive distribution will not give rise to taxable gain or loss if: (1) The distributing corporation distributes stock or securities of a corporation of which it has, immediately prior to the distribution, 80 per cent control as defined in section 368(c); (2) the distribution is not principally a device for distributing earnings and profits of either the distributing or controlled corporations; (3) the 5-year active business requirements of 355(b) are satisfied; and (4) the distributing corporation distributes either all its stock and securities in the controlled corporation, or so much thereof as constitutes control, as defined in 368(c), and retention of the balance is shown not to be in pursuance of a plan having as one of its principal purposes tax avoidance. The distribution itself must be either to a shareholder with respect to its stock, or a security holder with respect to its securities. * * *

Here, General Auto, the "distributing" corporation, distributed or caused to be distributed all the stock of Warehouse, which it controlled immediately prior to the distribution, to its stockholders with respect to their stock. But did the transaction meet the other requirements of the section?

Respondent's first argument is that General Auto's business prior to the distribution was a single integrated business and that, while the statute is silent on the point, the regulations clearly require that there be more than one business conducted by the distributing corporation and that these separate businesses must have each been conducted for at least 5 years preceding the distribution. Re-

---

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

    *       *       *       *       *       *       *

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business.

(2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

spondent claims that the regulations correctly interpret the congressional intent as determined from committee reports. We have reexamined the committee reports, including those relating to section 346 as suggested by respondent, and find nothing which would cause us to change our views on this point as expressed in the majority opinion in the *Coady* case. Furthermore, it is apparent, from the dissenting opinions filed by Judges of this Court, that in *Coady* we considered all the arguments advanced by respondent in support of his position here and they were rejected by the majority. The decision of this Court was affirmed per curiam by the Court of Appeals for the Sixth Circuit as a proper interpretation of the statute, and that decision is controlling here on this point.

In any event, we believe the evidence shows that General Auto conducted two separate businesses for at least 5 years prior to the distribution, one the warehouse distribution business, and the other the sale of automotive parts and equipment to dealers as a jobber, and that after the distribution Warehouse continued to conduct the former business and General Auto continued to conduct the latter. The testimony shows that there are four distinct and separate phases of distribution and sales in the auto parts industry: Those of the manufacturer, of the distributor, of the jobber, and of the dealer. The distributor keeps an inventory which he warehouses; the jobber does not warehouse but sells directly to the dealer, that is to the garageman who sells to the consumer or to the fleet owner who maintains his own garage facilities. The distributor receives compensation for this warehouse function in the form of either a discount from the manufacturer or commissions on sales to jobbers. It appears that formerly it was common practice for a single company to conduct both the distributor and the jobber business activities, buying at the lower distributor's price and in some instances reselling to dealers in competition with jobbers. This practice appears to have been stopped with respect to at least two of General Auto's suppliers in 1955 or 1956 by rulings of the Federal Trade Commission that this price discrimination violated the Clayton Act as amended by the Robinson-Patman Act. See *E. Edelmann & Co.* v. *Federal Trade Commission*, 239 F. 2d 152 (C.A. 7, 1956), and *P. & D. Manufacturing Co.* v. *Federal Trade Commission*, 245 F. 2d 281 (C.A. 7, 1957), both of which petitioners were suppliers of General Auto and wrote to General Auto suggesting a separation of its activities. But the fact that one company conducted both activities does not mean that they cannot be considered separate businesses.

Section 1.355–1(c), Income Tax Regs., defines a trade or business for purposes of section 355 of the Code as consisting of—

a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the activi-

ties included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and the payment of expenses. * * *

It seems to us that both the warehouse activity and the jobber activity conducted by General Auto prior to the distribution fall squarely within the above definition. It maintained a warehouse, stocked an inventory, and sold to jobbers under a different trade name in its distributor activity, which included the collection of income and the payment of expenses, and was conducted for the purpose of earning income from that activity alone. It also acquired automotive parts and equipment from manufacturers and sold them to dealers in its activities as a jobber, and these activities included the collection of income and the payment of expenses and were conducted for the purpose of earning income from that activity alone. While there is evidence that General Auto had some employees that devoted their time entirely to one of these activities or the other, and that it may have been possible from the records kept by the company and the general manager to determine or at least make a reasonable estimate, by allocating expenses, of the net profit derived from each of these activities, we do not think the fact that the two activities may have been conducted by the same company at the same location and with the same employees, and that the income and expenses of each were not separately reflected in its books and records, makes the two activities any less two separate businesses under the above definition than if they were conducted entirely separately as they were here after the distribution. Respondent's efforts to treat General Auto's business as a single business for purposes of his regulations interpreting the statute strengthens our conviction that the regulations denying the benefit of the statute to the division of a single business is an incorrect interpretation of the statute. We see no reason why the statute should not have been intended to apply to a situation such as this as well as to some of the situations approved by respondent in section 1.355–1(d), Income Tax Regs., provided the other requirements of the statute are met.

We find no conflict with the above conclusion and those reached by this Court in *Isabel A. Elliot*, 32 T.C. 283 (1959), and *Theodore P. Appleby*, 35 T.C. 755 (1961), affirmed per curiam 296 F. 2d 925 (C.A. 3, 1962), certiorari denied 370 U.S. 910 (1962), as suggested by respondent. In both of those cases we found that the rental of part of the real estate used by the taxpayers to conduct their principal businesses was merely incidental to the principal business being conducted and did not qualify as a business activity prior to the spinoffs. Here we find that both activities conducted by General Auto qualify as business activities.

Respondent also contends that the active conduct of the business requirement of the statute was not met here because *immediately* after the distribution Warehouse had only cash and that the use of cash was neither a business being conducted by Warehouse nor a business that had been conducted by General Auto for 5 years prior to the distribution. This requires a fragmentization of the transaction which we do not think is justified. It is clear from the written plan adopted by both corporations and the evidence of record as to what actually happened that the cash transferred to Warehouse was to be used to put Warehouse into the warehouse distribution business immediately, that it was but one step in the entire transaction all of the steps of which were to be completed simultaneously, and that Warehouse did begin the conduct of the same warehouse distribution business that had previously been conducted by General Auto immediately after the distribution, and General Auto immediately ceased such activity. It is true that the evidence indicates that only about $140,000 of the $200,000 transferred was used by Warehouse to acquire General Auto's inventory but it has been recognized administratively that cash for working capital, see Rev. Rul. 56–451, 1956–2 C.B. 208, and Rev. Rul. 56–555, 1956–2 C.B. 210, or for equalization of interests, see Rev. Rul. 56–655, 1956–2 C.B. 214, can be transferred to the controlled corporation in a spinoff without disqualifying the transaction as tax free under section 355, and we see no reason why this, per se, should disqualify this transaction under that section, provided it was not done for a proscribed purpose.

This brings us to the third point of respondent's contention, which poses a somewhat more difficult question. Petitioners must prove, in accordance with section 355(a)(1)(B), that the distribution of Warehouse shares by General Auto "was not used principally as a device for the distribution of the earnings and profits of" General Auto or of Warehouse. This point must necessarily be viewed in a somewhat negative manner in order to determine whether the distribution was incidental to the business purpose which petitioners contend motivated the spinoff. We find ample support in the record for petitioners' contention that the transaction was motivated, in part at least, by sound business reasons. General Auto had been experiencing resistance and resentment from some of its jobber-customers because of its jobber activity. This it had attempted to overcome by use of a different trade name for its distributor activities—but this had not been entirely successful. Manufacturers of some lines would not sell at the distributor's rate to a distributor who engaged in the dual activities. The evidence indicates that Warehouse was able to pick up several additional lines as a distributor that General Auto had not been able to get. And finally several of the manufacturers who had supplied General Auto suggested

that General Auto conduct its two activities by use of a separate corporation for each as a result of the Federal Trade Commission rulings.

The distribution was not effectuated to permit the stockholders of General Auto to sell their shares of stock of Warehouse. Cf. *Gregory* v. *Helvering*, 293 U.S. 465 (1935). Nor was the purpose to permit the shareholders to sell their shares of stock of General Auto and yet retain their interests in the distributor business. Cf. Rev. Rul. 58–68, 1958–1 C.B. 183. There is an indication in the record that one stockholder's shares in both corporations were redeemed shortly after the spinoff, but it is to be noted that all of her shares were redeemed and that respondent granted in a ruling the treatment of the redemption sought by the parties, and further, that respondent at the hearing disclaimed any reliance on the redemption to sustain the determination herein.

Finding ample business motivation for the spinoff and no evidence that the shareholders sold or exchanged their shares of either corporation, with the exception we have noted, we discern only one factor that would point to the use of the distribution for the proscribed purpose. On the books of the corporations, the amount of cash transferred to Warehouse, $200,000, was treated as capital of Warehouse and was charged to the earned surplus of General Auto. This treatment, argues respondent, accords with prior treatment of stock dividends of General Auto, the amounts of which were shown on the books to reduce earned surplus, and with the prior treatment of the amount of cash transferred to Welding. The transfer of $200,000 to Warehouse and the distribution of the Warehouse shares is nothing more, says respondent, than an attempt to eliminate $200,000 in earnings and profits and at the same time have no income realized by the shareholders. The earnings and profits of General Auto, as respondent argues, were to be allocated between General Auto and Warehouse pursuant to section 312(i)[4]—not eliminated. Respondent on brief points out, "should petitioners be sustained in their contention [that sec. 355 applies herein], it is evident that the distribution would be tax-free to the petitioners, and $200,000.00 in accumulated earnings would have vanished, according to the corporation's treatment of the item." It would follow, he suggests, that distributions from either corporation could, after the spinoff, be planned to take into account the absence of, or at least the reduced, earnings and profits as reflected on the books of the corpo-

---

[4] Sec. 312(i). ALLOCATION IN CERTAIN CORPORATE SEPARATIONS.—In the case of a distribution or exchange to which section 355 (or so much of section 356 as relates to section 355) applies, proper allocation with respect to the earnings and profits of the distributing corporation and the controlled corporation (or corporations) shall be made under regulations prescribed by the Secretary or his delegate.

rations as the source of fully taxable dividends. Were we forced in the present case to pass upon the efficacy of the bookkeeping treatment to wipe out or to shift the earnings and profits of General Auto, respondent's argument would exert considerably more force than it does. But the mere bookkeeping entries with regard to the capital account of Warehouse and the earned surplus account of General Auto were not, it appears, intended to have any effect on the statutory earnings and profits of either corporation. As petitioners point out on brief, the crediting or reduction of the earned surplus account on the books of a corporation does not necessarily effect a reduction of its earnings and profits for tax purposes. Proper allocation of the earnings and profits of the two corporations for tax purposes may be determined under respondent's regulations under section 312(i). The bookkeeping entries of the two corporations should not alone be controlling. *Commissioner* v. *Wheeler*, 324 U.S. 542 (1945). We do not think the transaction was used principally as a device for the distribution of the earnings and profits of either corporation.

We conclude that section 355 is applicable to the transaction here involved, that the transaction met all the requirements of that section, and that no gain or loss shall be recognized to petitioner on the receipt of her stock in Warehouse.

*Decision will be entered for the petitioners.*