350 F.2d 712
 ESTATE of Thorval J. LOCKWOOD, Deceased, National Bank of Commerce Trust and Savings Association, Successor to the First Trust Company of Lincoln, Nebraska, Executor, and Mrs. Margaret K. Lockwood, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 17908.
 United States Court of Appeals Eighth Circuit.
 September 17, 1965.
 
 Charles E. Wright, of Cline, Williams, Wright, Johnson, Oldfather & Thompson, Lincoln, Neb., for petitioner.
 Mark S. Rothman, Atty., Tax Div., Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., for respondent.
 Before VOGEL, MATTHES and RIDGE, Circuit Judges.
 VOGEL, Circuit Judge.
 
 
 1
 The single question involved in this review of an unreported decision of the Tax Court of the United States, entered August 26, 1964, is whether the "spin-off" of part of the business conducted by the Lockwood Grader Corporation of Gering, Nebraska, (hereinafter Lockwood) through the organization of a new corporation, Lockwood Graders of Maine, Inc. (hereinafter Maine, Inc.) was tax-free to petitioners, recipients of the stock of Maine, Inc., under 26 U.S.C.A. § 355 (Int. Rev.Code).[1] The government contended that the spin-off was not tax-free since the requirements of § 355(b) (2) (B) relating to the conducting of an active business for five years prior to the date of distribution had not been met. The government apparently conceded and the Tax Court found that the petitioners had met all other requirements to qualify under § 355 for tax-free treatment. The Tax Court upheld the government's contention and petitioners appeal.
 
 
 2
 The now deceased Thorval J. Lockwood, whose interests herein are represented by his duly qualified executor, National Bank of Commerce Trust and Savings Association, and his wife Margaret were the sole stockholders of Lockwood and had been so since its incorporation under Nebraska law in 1946. Lockwood's predecessor, Lockwood Graders, was a partnership formed in 1935 for the purpose of producing and selling a portable potato sorting machine invented by the decedent. Starting in the early spring of each year Thorval and Margaret drove to Alabama and worked their way north through Missouri to North Dakota for the purpose of selling Lockwood products. The equipment was sold in "all of the potato growing areas of the United States" but primarily in the biggest growing areas such as North Dakota, Idaho and Colorado.
 
 
 3
 From 1946 to 1951, inclusive, Lockwood operated its business of manufacturing and selling wash lines, potato machinery, parts and supplies to potato shippers in the potato growing areas. Though Lockwood continued to have its principal place of business at Gering, Nebraska, branches were opened, as the business expanded, in Grand Forks, North Dakota; Antigo, Wisconsin; Monte Vista, Colorado; and Rupert, Idaho. These branches performed both manufacturing and sales functions. In 1952, under a reorganization plan,[2] these branches were separately incorporated to promote greater efficiency and to properly provide for expansion. Assets of Lockwood were exchanged for all of the stock of each new corporation and the stock so exchanged was passed without consideration to Thorval and Margaret as sole stockholders of Lockwood. The reorganization plan, among other things, was specifically designed to make use of the tax-free provisions of what is now § 355.
 
 
 4
 In the early 1950's Lockwood and the other controlled corporations changed the nature of their business somewhat by selling to individual farmers as well as to potato suppliers. Lockwood had previously dealt primarily in grading equipment but at this time it began to manufacture and sell field equipment such as harvesting pieces, bin holders and vine beaters as well.
 
 
 5
 Beginning as early as 1947 Lockwood began to make some sporadic and relatively inconsequential sales in the north-eastern part of the United States. From 1949 to 1955 the primary sales of products and parts in that part of the country were made to Gould & Smith, Inc., a retailer of farming and industrial equipment, of Presque Isle, Maine (although there are no records of sales made to them in 1952). Such sales were found to be of a relatively small volume by the Tax Court. On November 15, 1954, Lockwood established a branch office in Presque Isle, Maine, from which to handle Lockwood products. On March 1, 1956, pursuant to the 1951 plan for reorganization set out in footnote 2, supra, the Maine branch office was incorporated under the laws of Maine with its principal place of business at Presque Isle, Maine. Maine, Inc., was a wholly owned subsidiary of Lockwood. On incorporating, Lockwood transferred to Maine, Inc., $23,500 in assets consisting of petty cash totalling $150.00, accounts receivable totalling $4,686.67, automobiles and trucks worth $1,100, shop equipment worth $295.00, office furniture and fixtures worth $81.60, and inventory worth $17,186.73. In return for these assets Maine, Inc., issued all of its stock, 235 shares at $100.00 par value, to Lockwood. On March 31, 1956, Lockwood distributed 162 of these shares of Maine, Inc., to Thorval and 73 of them to Margaret. This distribution gave rise to the controversy here involved.
 
 
 6
 The Tax Court held this distribution to be outside of § 355. According to the Tax Court there was:
 
 
 7
 "* * * the absence of evidence that the Maine business was actively conducted during the months between March 31, 1951, and August 1953 — a span of time totaling over 40 per cent of the requisite five-year period [required by § 355(b) (2) (B).]" (Emphasis supplied.)
 
 
 8
 The Tax Court found that the Maine business was not actively and continuously conducted until August 1953, at which time a Lockwood salesman traveled to Maine and personally solicited orders from farmers and businessmen other than Gould & Smith. We do not disagree with the factual finding of the Tax Court as to the active conduct of Lockwood's business in Maine prior to the incorporation of Maine, Inc. However, the Tax Court, for reasons set out below, erred in looking only at the business performed by Lockwood in Maine to determine if the five-year active business requirement had been met prior to the incorporation of Maine, Inc. Nothing in the language of § 355 suggests that prior business activity is only to be measured by looking at the business performed in a geographical area where the controlled corporation is eventually formed. In this case, when the entire Lockwood market is viewed, it can be seen that Lockwood was engaged in active business as required by § 355 for the five years prior to the incorporation of Maine, Inc. Since its incorporation Maine, Inc., has carried on the same kind of manufacturing and selling business previously and concurrently performed by Lockwood. Thus all § 355 prerequisites are met and the Tax Court erred in determining this was not a tax-free transfer.
 
 
 9
 At this point it would be helpful to look at the evolvement of what is now § 355. Prior to 1924 a distribution to stockholders pursuant to a spin-off was taxed as a dividend. From 1924 to 1932, however, the revenue acts changed position and provided spin-offs could be tax-free. From 1934 to 1950 tax-free spin-offs were again abolished since this device was being used as a method for distributing earnings and profits, which would otherwise be taxable dividends, through the issuance of stock in the controlled corporation. Such stock could be disposed of at the more favorable capital gain rates. Because of the usefulness of the spin-off device in the achievement of corporate growth and flexibility, Congress again accorded it tax-free status in 1951.[3] At that time certain conditions were imposed to prevent any abuse from using this device. In 1954 the tax-free spin-off was continued as § 355 of the Code with additional tax avoidance safeguards which included the five-year active business requirement involved in this case.
 
 
 10
 As stated by the Second Circuit in Bonsall v. Commissioner, 2 Cir., 1963, 317 F.2d 61, at page 65:
 
 
 11
 "* * * Only long application may completely clarify the difficult terminology of section 355."
 
 
 12
 With this we agree. However, certain things have become clear since the enactment of § 355 in 1954. After much controversy it has been determined that tax-free treatment will not be denied to a transaction under § 355 merely because it represents an attempt to divide a single trade or business. See United States v. Marett, 5 Cir., 1963, 325 F.2d 28; Coady v. Commissioner, 33 T.C. 771, affirmed per curiam, 6 Cir., 1962, 289 F.2d 490. The Commissioner has acceded to the holdings of Marett and Coady in Rev. Rule 64-147, 1964-1, Cum.Bull. 136, even though the Commissioner had previously insisted, in § 1.355-1(a) of the Income Tax Regulations, that two or more existing businesses had to be actively operated the five years prior to distribution. The Tax Court in Coady, at pages 777-778 of 33 T.C., states:
 
 
 13
 "Respondent maintains that a reading of 355(b) (2) (B) [set out at footnote 1, supra] in conjunction with the requirement of 355(b) (1) [set out at footnote 4, infra] * * indicates Congress intended the provisions of the statute to apply only where, immediately after the distribution, there exist two separate and distinct businesses, one operated by the distributing corporation and one operated by the controlled corporation, both of which were actively conducted for the 5-year period immediately preceding the distribution. In our judgment the statute does not support this construction.
 
 
 14
 "As noted, the only reference to plurality appears in section 355(b) (1), and deals with corporate entities, not businesses. Recognizing the divisive nature of the transaction, subsection (b) (1) contemplates that where there was only one corporate entity prior to the various transfers, immediately subsequent thereto, there will be two or more corporations. In order to insure that a tax-free separation will involve the separation only of those assets attributable to the carrying on of an active trade or business, and further to prevent the tax-free division of an active corporation into active and inactive entities, (b) (1) further provides that each of the surviving corporations must be engaged in the active conduct of a trade or business. [Emphasis by the court.]
 
 
 15
 "A careful reading of the definition of the active conduct of a trade or business contained in subsection (b) (2) indicates that its function is also to prevent the tax-free separation of active and inactive assets into active and inactive corporate entities. This is apparent from the use of the adjective `such,' meaning before-mentioned to modify `trade or business' in subsection (b) (2) (B), thus providing that the trade or business, required by (b) (2) (B) to have had a 5-year active history prior to the distribution, is the same trade or business which (b) (2) (A) requires to be actively conducted immediately after the distribution. Nowhere in (b) (2) do we find, as respondent suggests we should, language denying the benefits of section 355 to the division of a single trade or business. [Emphasis by the court.]
 
 
 16
 "Nor can respondent derive support for his position by reading sub-sections (b) (1) and (b) (2) together, inasmuch as the plurality resulting therefrom is occasioned, not by any requirement that there be a multiplicity of businesses, but rather by the divisive nature of the transaction itself: i. e., one corporation becoming two or more corporations. Moreover, from the fact that the statute requires, immediately after the distribution, that the surviving corporations each be engaged in the conduct of a trade or business with an active 5-year history, we do not think it inevitably follows that each such trade or business necessarily must have been conducted on an individual basis throughout that 5-year period. As long as the trade or business which has been divided has been actively conducted for 5 years preceding the distribution, and the resulting businesses (each of which in this case, happens to be half of the original whole) are actively conducted after the division, we are of the opinion that the active business requirements of the statute have been complied with." (Emphasis supplied.)
 
 
 17
 Respondent in the instant case, although claiming to accept the single business interpretation, points to the language of § 355(b) (1)[4] and argues, as did the government in Coady, that the word "and" in that section means that, in determining whether or not the active business requirement was met, one has to look at both the business done by the distributing corporation (Lockwood) and the business done as such by the controlled corporation (Maine, Inc.) and its predecessors in Maine. Contrary to the government's position, once it has been ascertained that two or more trades or businesses are not required for § 355 to apply, the crucial question becomes whether or not the two corporations existing after distribution are doing the same type of work and using the same type of assets previously done and used by the prior single existing business. § 355(b) (1) has no relevance to respondent's point once it has been determined that only a single business is required.
 
 
 18
 Here the five years of prior activity we are concerned with involve the prior overall activity of Lockwood. Previous to 1956 Lockwood had carried on in toto what Maine, Inc., would later carry on in part in the northeast. We are not concerned with the prior activity of Lockwood in the northeast only, for Congress has never intimated that such a geographical test should be applied and we are not about to apply such a test now. A perusal of the House and Senate Reports indicates conclusively that at no time did the House or the Senate contemplate any kind of geographic test in applying the five-year active business requirement.[5] The facts clearly show that Lockwood, in fact, was actively conducting the trade or business involved five years prior to the distribution period.
 
 
 19
 One case, Patricia C. Burke v. Commissioner, 1964, 42 T.C. 1021, did discuss the past business of a controlled corporation as performed in a limited geographical area in finding the prequisites of § 355 had been met. That case did not, however, hold that there was in fact a geographical test. Further, at page 1028 that court set out what we believe to be the test:
 
 
 20
 "* * * as long as the business which is divided has been actively conducted for 5 years before the distribution and the resulting businesses are actively conducted after the division, the active business requirements of the statute are met. Cf. also H. Grady Lester, 40 T.C. 947 (1963)."
 
 
 21
 Since there is no Congressional intent evidenced to the contrary, the test, restated, is not whether active business had been carried out in the geographic area later served by the controlled corporation but, simply, whether the distributing corporation, for five years prior to distribution, had been actively conducting the type of business now performed by the controlled corporation without reference to the geographic area. In the instant case the facts are abundantly clear that Lockwood had been actively engaged in the type of business later carried on by Maine, Inc., if one refers to a national rather than just the northeastern market.
 
 
 22
 It was mentioned earlier in this opinion that beginning in 1950 Lockwood began to sell field equipment as well as grading equipment. The respondent apparently does not contend, nor do we find, that Lockwood so changed its business as to be engaged in a new business that had been active for only two years prior to the incorporation of Maine, Inc. Lockwood meets the requirements of an existing five-year active business as set out by the Conference Committee in Conference Report No. 2543 at page 5298 of 3 U.S.C.Cong. & Adm.News, 1954:
 
 
 23
 "It is the understanding of the managers on the part of the House, in agreeing to the active business requirements of section 355 and of section 346 (defining partial liquidations), that a trade or business which has been actively conducted throughout the 5-year period described in such sections will meet the requirements of such sections, even though such trade or business underwent change during such 5-year period, for example, by the addition of new, or the dropping of old, products, changes in production capacity, and the like, provided the changes are not of such a character as to constitute the acquisition of a new or different business." (Emphasis supplied.)
 
 
 24
 In § 1.355-4(b) (3) of the Income Tax Regulations the Commissioner specifically adopts the above-quoted portion of the Committee Report.
 
 The respondent contends:
 
 25
 "If the taxpayers' argument prevails, then any corporation with a five-year history could distribute any of its assets regardless of when they were acquired and regardless of what kind of business they are in after the division, as long as the distributing corporation is in an active business. In other words, taxpayer argues that the five-year history rule requires that only the business of the distributing corporation have a five-year history. For instance, suppose a large manufacturing corporation with a ten-year life acquired some data processing machines in order to better control its inventory and work-in-process flow. If taxpayers' argument is correct, a year later this corporation could transfer all the data processing equipment to a new corporation in exchange for its stock, spin off the stock and claim a tax-free distribution under Section 355 since the manufacturing corporation had more than a five-year life and the data processing business, once an integral part of the original business, was being actively conducted after the spin-off. Moreover, the same logic would allow the spin-off of real estate owned by the manufacturing corporation and used in its business."
 
 
 26
 The fears of the government are unfounded. The example of the manufacturing company is more closely akin to the Bonsall case, supra, and is factually distinguishable from the instant case. Here Lockwood had not just recently acquired that part or segment of its business that was spun off. Rather, what was spun off was a part of the business Lockwood had always performed in the past and which it has continued to perform since the distribution. If Lockwood had, just before distribution, acquired or opened up a new or entirely different aspect of its business unrelated to prior activities and had spun this off to the controlled corporation, a different result might ensue. In Bonsall the distributing company, a dealer in floor covering materials, attempted to assert a tax-free spin-off occurred when a rental business of de minimis proportions was transferred to a subsidiary with the stock of the subsidiary being distributed to the distributor's shareholders. The Second Circuit held at page 64 of 317 F.2d:
 
 
 27
 "There is ample support for the factual determination that Albany Linoleum [the distributing company therein] was not actively conducting a real-estate rental business. * * the portion of its income realized from real estate rentals was minute. * * * No activity appeared beyond a few casual conversations with prospective tenants. Moreover, most of the floor-space of the two buildings combined was occupied by the floor-covering business. Only a very small part was available for rental, and an even smaller part actually leased. The continuing rental to Armstrong Cork Co. which provided most of the rental income appeared to be an accommodation to a large supplier of the floor-covering business and thus an adjunct to it, rather than indicative of an independent business, for the Tax Court found that the premises were let at less than fair rental value over the five-year period. Finally, no separate records of rental income and expenses were kept. Absence of such records is at least probative of the fact that the managers of Albany Linoleum did not regard it as engaged in an independent rental business. The Tax Court was plainly justified in concluding that the small amount of rental activity was merely an incidental part of the sole business of the corporation — wholesale floor-coverings. See Theodore F. Appleby, 35 T.C. 755 (1961), aff'd per curiam, Appleby v. C. I. R., 296 F.2d 925 (3 Cir.), cert. denied 370 U.S. 910, 82 S.Ct. 1256, 8 L.Ed. 2d 404 (1962); Isabel A. Elliott, 32 T.C. 283 (1959)."
 
 
 28
 Thus it is clear that in respondent's example and in Bonsall the business sought to be spun off was not actively engaged in for five years prior to distribution, which is not the situation in the instant case. Here, what was spun off was merely an integral part of what had been Lockwood's primary and only business from its inception.
 
 
 29
 Further, it should be remembered that even if the five-year active business requirement is met, there is further protection in § 355 against spin-offs being used for mere tax avoidance, which would be contrary to Congressional intent. § 355 (a) (1) (B) will only allow a tax-free spin-off transaction where "* * * the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both * * *." Under this section, the government and the courts have great latitude in preventing the abuses which the respondent fears will happen by finding for petitioners in this case. Cf. Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596. Herein the respondent does not contend that the purpose of the spin off was designed primarily for tax avoidance. No earnings and profits were in fact distributed to Thorval and Margaret. The Tax Court stated that:
 
 
 30
 "* * * we do not view the distribution as running afoul of the congressional purpose behind section 355, * * *."
 
 
 31
 This being so, and since petitioners otherwise complied with § 355, the decision of the Tax Court will be reversed. The transaction herein involved cannot be treated as a taxable distribution of dividends.
 
 
 
 Notes:
 
 
 [1]
 Under § 355(a) (1) the stock of a controlled corporation held and distributed by the distributee (controlling) corporation to its shareholders is a non-taxable transaction, if, in pertinent part:
 "(B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock or securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),
 "(C) the requirements of subsection (b) (relating to active businesses) are satisfied, * * *."
 Under § 355(b) (2) a corporation is engaged in the active conduct of a trade or business if, in pertinent part:
 "(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution, * * *."
 
 
 [2]
 The plan provided,inter alia, that:
 "1. The reorganization shall be in compliance with the `spin-off' method provided by Section 112(b) (11) of the Internal Revenue Code [of 1939] of the United States.
 "2. New corporations will be organized in the states of North Dakota, Wisconsin, Colorado, Idaho, and such other states as may be hereafter determined by the Board of Directors of Lockwood * * * for the best interests of Lockwood * * * and its stockholders, as domestic corporations in the states in which their principal places of business are located * * *.
 "3. Upon completion of their organization in each state, each of these new corporations shall take over the business now conducted by the branch of the old corporation in its state and the old corporation shall cease to maintain a place of business or to conduct major business operations in that state. The new corporations shall take over the business of the old corporation in its area as of January 1, 1952.
 "4. There shall be transferred to each of said new corporations such assets pertaining to each branch as in the opinion of the president of Lockwood * * * are necessary or desirable for the new corporation in the operation of the business formerly conducted by the branch taken over by it, including stock, equipment, accounts payable and receivable, choses in action, and other assets, if any. * * *
 * * * * *
 "6. In consideration for such transfers, each new corporation shall issue to Lockwood * * *, or to its stockholders in proportion to the stock held by each therein, stock fully paid up, in an amount equal to the value of the assets transferred to it.
 "7. If issued to Lockwood * * *, the stock of each new corporation shall be immediately transferred by Lockwood * * * to its stockholders in proportion to the stock held by each stockholder in Lockwood * * *.
 * * * * *
 "9. It is intended that this plan of reorganization shall include new corporations to be organized in States other than those specifically named herein as the need for additional corporations appears necessary to provide for proper growth and decentralization of the business."
 
 
 [3]
 Revenue Act of 1951, Chap. 521, 65 Stat. 452, § 317(a). This was codified as § 112 (b) (11) of the Internal Revenue Code of 1939
 
 
 [4]
 § 355(b) (1) provides in pertinent part that § 355(a) shall apply if
 "(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, * * *." (Emphasis supplied.)
 
 
 [5]
 See H.Rep. No. 1337, S.Rep. No. 1622 and Conference Report No. 2543 of the Second Session of the 83rd Congress. (Discussions involving § 355 are set out in 3 U.S.C.Cong. & Adm.News (1954), pp. 4064-4066, 4265-4266, 4681-4683, 4903-4906, 5297-5298.) The Commissioner would seem to be in error in implying such a geographic test exists in Examples 8 and 9 of § 1.355-1(d) of the Income Tax Regulations