LLOYD BOETTGER AND VIVIAN BOETTGER, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5632–66, 5689–66, 5690–66. Filed December 2, 1968.

---

[1] Cases of the following petitioners are consolidated herewith : Theodore P. Pulas and Dorothy H. Pulas, docket No. 5689–66 ; and John A. Cook and Virlie V. Cook, docket No. 5690–66.

*Richard W. Konig*, for the petitioners in all dockets.

*Leonard T. Cain*, for the petitioners in docket Nos. 5689–66 and 5690–66.

*Eugene H. Ciranni* and *Nicholas G. Stucky*, for the respondent.

WITHEY, *Judge:* The respondent determined the following deficiencies in these consolidated cases:

| Docket No. | Year | Deficiency |
|---|---|---|
| 5632–66 | 1964 | $14, 402. 45 |
| 5689–66 | 1964 | 13, 205. 57 |
| 5690–66 | 1964 | 9, 682. 39 |

The issue presented is whether section 355 [2] applies to the distributions to petitioners by Oak Park of the stock of its wholly owned subsidiary, Oak Park North.

### FINDINGS OF FACT

All of the facts having been stipulated, they are so found.

Lloyd Boettger and his wife Vivian Boettger, Theodore P. Pulas and his wife Dorothy H. Pulas, and John A. Cook and his wife Virlie V. Cook each filed timely joint income tax returns for the calendar year 1964 with the district director, San Francisco, Calif. Since each wife is a party to these proceedings only because she filed a joint income tax return for the year 1964, Lloyd Boettger, Theodore P. Pulas, and John A. Cook will hereafter be referred to as petitioners. Petitioners and their wives were each legal residents of the State of California on the dates of the filing of the petitions herein.

Oak Park Community Hospital, Inc. (hereinafter referred to as Oak Park), was a California corporation organized on November 8, 1956, for the purpose of conducting a hospital business in the City of Stockton, Calif. The following individuals owned all the stock of Oak Park from its inception to its dissolution in 1964:

| Name | Number of shares | Name | Number of shares |
|---|---|---|---|
| Lloyd Boettger | 1 | Riener G. Nielsen | 1 |
| Theodore P. Pulas | 1 | Gene E. Moffatt | 1 |
| John A. Cook | 1 | Michael F. LoPresti | 1 |
| L. W. Gaertner | 1 | | |
| | | | 7 |

Oak Park actively conducted the profitable operation of a hospital located in Stockton, Calif., from 1956 until March 31, 1964. Since that date, the same hospital has been profitably operated by a successor corporation.

---

[2] All references are to the Internal Revenue Code of 1954 unless otherwise noted.

On August 14, 1961, Oak Park in a taxable transaction purchased all the assets of South Side Community Hospital, Inc., a corporation which had up to that date owned and operated a hospital in Los Angeles, Calif. The assets acquired by Oak Park included, *inter alia*, the hospital building, including the furniture, fixtures, and equipment therein, stock in trade, goodwill, accounts receivable, books of account, existing licenses and permits, and the right to conduct the business of operating a hospital in and upon the acquired property. Oak Park's acquisition of these assets was made from its corporate funds and no outside capital was employed. None of the owners of South Side Community Hospital, Inc., were related in any manner to any of Oak Park's stockholders.

From August 15, 1961, until March 31, 1964, a period of 2½ years, Oak Park, as owner, operated the Stockton and Los Angeles hospitals as relatively small general and maternity hospitals of approximately the same bed capacity. During this period, the details of Oak Park's operation of the two hospitals included the following: (1) The Stockton hospital primarily served the medical needs of the Stockton region and its patients came mainly from that area, whereas the Los Angeles hospital served primarily the medical needs of the central Los Angeles region and its patients came mainly from that area; (2) each hospital had a separate staff of doctors who performed medical services for patients; (3) the same accounting firm and the same attorney represented Oak Park in all its accounting and legal matters with respect to both hospitals; (4) the same insurance company wrote the hospital malpractice insurance and hospital employee dishonesty insurance policies for both hospitals; (5) the nonperishable food served to patients and employees at both hospitals was obtained from the same institutional supplier; however, no common warehouse or supply of food was maintained for the two hospitals and the food was ordered by the hospital administrator as needed, pursuant to an oral contract with the institutional supplier; (6) Oak Park consistently presented financial statements to prospective creditors on a consolidated basis without differentiating the Stockton hospital from the Los Angeles hospital; however, separate profit and loss statements were prepared monthly for each hospital; (7) Ethel George was the administrator of Oak Park and in this capacity she served as administrator of both the Stockton and Los Angeles hospitals, commuting between them in order to perform her duties; (8) patient accounts were maintained at each hospital by employees thereof; also, each hospital maintained subsidiary invoice records relating to its own expenses; however, Ethel George supervised the maintenance of the patient accounts at both hospitals and expenditures at each hospital were required to be approved by her; and (9) each hospital maintained a separate com-

mercial bank account; however, only Ethel George, as president and secretary-treasurer of Oak Park, had authority to sign checks on these bank accounts; also, Ethel George reconciled the bank accounts.

During the course of Oak Park's operation of the two hospitals, a dispute arose among its stockholders concerning certain matters related to the Los Angeles hospital. In this dispute, the petitioners along with L. W. Gaertner maintained one position, whereas the other three stockholders maintained another. This dispute became bitter and at one point petitioners threatened legal action to resolve it. Thereafter, the stockholders met and it was agreed that the splitting up of Oak Park was the only mutually acceptable solution to the stockholders' dispute.

By a letter dated January 30, 1964, the three dissident stockholders offered, in effect, that they would take the Los Angeles hospital while petitioners and L. W. Gaertner would take the Stockton hospital. Based on this letter offer, an "Agreement re Split-Up" (hereinafter referred to as the agreement) was executed by the stockholders of Oak Park. Pursuant to this agreement, two new California corporations were formed, Oak Park Community Hospital, Inc., of Northern California (hereinafter referred to as Oak Park North), and GERM Hospital, Inc. (hereinafter referred to as Germ). Thereafter, Oak Park transferred the assets related to the Stockton hospital to Oak Park North in exchange for all its stock and transferred the assets related to the Los Angeles hospital to Germ in exchange for all its stock.

On March 31, 1964, pursuant to the agreement, Oak Park distributed all the stock of Oak Park North [3] pro rata to the petitioners and L. W. Gaertner in return for and with respect to their stock in Oak Park. Also on that date, again pursuant to the agreement, Oak Park distributed the stock of Germ pro rata to its other three stockholders in return for and with respect to their stock in Oak Park. After these distributions, Oak Park was liquidated.

Immediately before the distributions described above, Oak Park controlled Oak Park North and Germ, and owned no assets other than the stock of these two corporations.

Immediately after the distributions described above, Oak Park North and Germ were each engaged in the conduct of a trade or business, i.e., the operation of a hospital in Stockton and Los Angeles, respectively.

The Los Angeles hospital had been actively operated throughout the 5-year period ending on March 31, 1964, for the first part of this

---

[3] The parties have stipulated that all the stock and securities of Oak Park North were distributed to the four stockholders. However, they further stipulated that immediately before this distribution, Oak Park owned no assets other than the stock of Oak Park North and Germ. Nowhere else in the record herein is there any mention of securities of Oak Park North and we assume their mention here is an error in the parties' stipulations.

period until August 14, 1961, by the predecessor of Oak Park, and for the remainder thereof by Oak Park.

On March 31, 1964, Oak Park's earned surplus amounted to $67,520.26 and its capital or paid-in surplus amounted to $37,742.14.

The total gain realized by each petitioner on March 31, 1964, was $58,237.59 based on a fair market value on that date of $67,937.59 for the Oak Park North stock which each received and a total basis of $9,700 in the Oak Park stock each surrendered.

## OPINION

The issue presented for decision herein concerns the applicability of section 355 [4] to the distribution by Oak Park to certain of its stockholders, including petitioners, herein, of the stock of its wholly owned subsidiary, Oak Park North. Petitioners maintain that all the requirements of the section were satisfied, thereby endowing that distribution with tax-free status,[5] while respondent contends to the contrary. We agree with respondent.

---

[4] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(a) EFFECT ON DISTRIBUTEES.—

(1) General Rule.—If—

(A) a corporation (referred to in this section as the "distributing corporation")

(i) distributes to a shareholder, with respect to its stock, * * *

\* \* \* \* \* \* \*

solely stock or securities of a corporation (referred to in this section as "controlled corporation") which it controls immediately before the distribution,

(B) the transaction was not used principally as a device for the distribution of earnings and profits of the distributing corporation or the controlled corporation or both * * *

(C) the requirements of subsection (b) (relating to active businesses) are satisfied, and

(D) as part of the distribution, the distributing corporation distributes—

(i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, * * *

\* \* \* \* \* \* \*

then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.

\* \* \* \* \* \* \*

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

\* \* \* \* \* \* \*

(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporation and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business,

(2) DEFINITION.—For the purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged.

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, * * *

[5] Our use of the phrase "tax free" does not mean that any gain realized on the distribution by the stockholders will escape taxation altogether; merely that recognition of that gain is deferred until the later disposition by them of the stock they received.

Section 355 was brought into the tax law by the 1954 Code to aid corporate divisions by providing for stockholder nonrecognition of gain on certain stock distributions made to them. Thus, in a corporate "split-up" [6] nonrecognition of gain to the stockholders will result if: (1) The distributing corporation distributes stock of corporations of which it has, immediately prior to the distribution, 80-percent control; (2) the distribution is not principally a device for distributing earnings and profits of either the distributing or controlled corporations; (3) the 5-year active-business requirements of section 355(b) are satisfied; and (4) the distributing corporation distributes all the stock it has of the controlled corporations.

Respondent contends solely that the 5-year active-business requirements of section 355(b) are not satisfied. In this regard, he maintains that Germ's postdistribution operation of the Los Angeles hospital fails to satisfy (b)(2)(B) and (C) because that particular business was purchased by Oak Park in a taxable transaction less than 5 years before the split-up. More specifically, it is argued that the 5-year active-conduct rule of (b)(2)(B) is violated because (b)(2)(C) prevents the "tacking" by Oak Park of its predecessor, South Side Community Hospital, Inc.'s period of operation of the Los Angeles hospital. Thus, the business acquired by Germ from Oak Park had been actively conducted for only 2½ years, i.e., the period of Oak Park's actual operation thereof. In reply, petitioners assert that the Los Angeles hospital did not constitute a separate trade or business when operated by Oak Park, but rather that Oak Park, during the period August 15, 1961, to March 31, 1964, conducted a single hospital business at two locations (Los Angeles and Stockton). Thus, they argue that the split-up of Oak Park was a split-up of one consolidated business with a longer than 5-year business history, and, therefore, they are entitled to the benefits of section 355 under the rationale of *Edmund P. Coady*, 33 T.C. 771 (1960), affd. 289 F. 2d 490 (C.A. 6, 1961).

The parties, in the resolution of the question presented herein, focus on the narrow point of whether Oak Park's operation of the Stockton and Los Angeles hospitals from August 1961 to March 1964 constituted the operation of a single trade or business during that period, or the operation of two separate trades or businesses. It is our conclusion, however, that petitioner must fail regardless of how that narrow point is decided for the reasons discussed below.

---

[6] In a "split-up" an existing corporation A incorporates all of its assets in two or more separate corporations B and C in exchange for their entire capital stock. The B and C stock is then distributed to the A stockholders in exchange for all the outstanding A stock. A then liquidates and ceases to exist.

Section 355 (b) (2) (C) specifically provides that:

*such* trade or business was not acquired within \* \* \* [the 5-year period ending on the date of distribution] in a transaction in which gain or loss was recognized in whole or in part, \* \* \* [Emphasis added.]

It is clear to us that the word "such" in the above provision refers to the trade or business engaged in by the controlled corporation *after* the distribution. As this Court stated in the *Coady* case, at page 777, in interpreting (b) (2) (B) —

the use of the adjective "such," meaning before-mentioned, to modify "trade or business" in subsection (b) (2) (B), thus \* \* \* [provides] that the trade or business, required by (b) (2) (B) to have had a 5-year active history prior to the distribution, is the same trade or business which (b) (2) (A) requires to be actively conducted immediately after the distribution. \* \* \*

And the use of the word "such" in (b) (2) (C) manifestly is the same as in (b) (2) (B).

In the instant case, the trade or business being conducted by Germ *after* Oak Park's distribution of the Germ stock is that of operating the Los Angeles hospital, which is the *same* business that Oak Park acquired in a concededly *taxable* transaction 2½ years earlier.[7] In our opinion, the fact that for 2½ years, the Los Angeles hospital might have been operated in such a manner as to constitute an integral part of Oak Park's previous business [8] is irrelevant in determining whether the distribution herein should be tax free. For petitioners' theory herein, proceeding on the assumption that a corporation may acquire a going business in a taxable transaction, the stock of which could thereafter be distributed tax free under section 355, based on the fact that the business was conducted for a period of time less than 5 years as part of the previously existing corporate business of the acquiring corporation, must fail in the face of the clear statutory language of section 355 (b) (2) (C). That provision, enacted to prevent the "bailing-out" of accumulated earnings by the simple expedient of a corporation purchasing a going business as a temporary investment in anticipation of the distribution of that business to its shareholders in a tax-free corporate division under section 355,[9] dictates the result in this case where a distribution of the purchased business occurred only 2½ years after its acquisition.

---

[7] The petitioners make no assertion that business acquired by Germ was in any material way different from the business Oak Park acquired from South Side Community Hospital, Inc.

[8] We express no opinion on the question of whether Oak Park, during the period from Aug. 15, 1961, to Mar. 31, 1964, operated a single business in two locations or two separate businesses. See *Lockwood's Estate* v. *Commissioner*, 350 F. 2d 712 (C.A. 8, 1965) ; *Patricia W. Burke*, 42 T.C. 1021 (1964) ; *Marne S. Wilson*, 42 T.C. 914 (1964), reversed on other grounds 353 F. 2d 184 (C.A. 9, 1965) ; *H. Grady Lester, Jr.*, 40 T.C. 947 (1963).

[9] Since sec. 355 (b) (2) (B) merely requires that the business had been actively conducted for 5 years prior to distribution, regardless of by whom, in the absence of (b) (2) (C), a corporation could acquire a business that had been conducted for more than 5 years by the seller, and shortly thereafter distribute that business tax free to its shareholders in a corporate division.

If petitioners' position in the instant case were to succeed, the application of section 355(b)(2)(C) would be avoided by the happenstance that Oak Park acquired a second hospital rather than some other corporate business. Surely, if Oak Park had acquired a bowling alley in a taxable transaction and 2½ years later separately distributed the stock of the hospital and the bowling alley, those distributions would not be within the ambit of section 355.[10] The fact that by either accident or design, Oak Park acquired another hospital business should not entitle it to any different result.

We reach our conclusion herein with full realization that this case does not present a purposeful attempt to "bail-out" corporate earnings by acquisition of a business for later distribution. The record clearly establishes a valid business purpose for the distribution and respondent makes no argument that it was a device for distributing earnings and profits. Nevertheless, petitioners cannot prevail. Section 355, rightly or wrongly, operates on the mandatory proposition that the distribution of a business that has not been "actively conducted" for a 5-year period, as that term is defined in (b)(2)(A)-(D), is not entitled to tax-free treatment. The reason for the distribution of the inadequately aged business is irrelevant as far as that section is concerned.

Under these circumstances, we have no alternative but to hold that the distribution by Oak Park of Oak Park North stock to petitioners is not a distribution entitled to tax-free treatment under section 355.

*Decisions will be entered for the respondent.*

---

[10] The requirements of sec. 355(b)(2)(B) and (C) would be violated.