RIENER C. NIELSEN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

GENE E. MOFFATT AND EDITH MOFFATT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2893-70, 2894-70.   Filed November 27, 1973.

*Franklin K. Lane III*, for the petitioners.
*Stephen B. Zorick, Jr.*, for the respondent.

OPINION

IRWIN, *Judge:* Respondent determined the following deficiencies and overpayments in the income taxes of petitioners:

| Docket No. | Year | Deficiency | Overassessment |
|---|---|---|---|
| 2893–70 | {1964, 1965} | $8,413.99 | $62 |
| 2894–70 | {1964, 1965} | 6,786.61 | 128 |

In docket No. 2893–70 petitioner offered no evidence or argument with respect to a casualty loss issue, and we deem that issue to have been conceded by petitioner. Accordingly, the only issue for determination is whether petitioners may treat distributions of stock received by them in 1964 in a corporate splitup as nontaxable under section 355(a).[1]

All of the facts have been stipulated and they are so found.

Petitioners are Riener C. Nielsen and Gene E. Moffatt and his wife Edith Moffatt, who all resided in Los Angeles, Calif., at all relevant times. Petitioners filed timely income tax returns for 1964 with the district director of internal revenue, Los Angeles, Calif. Edith Moffatt is a petitioner solely by reason of her filing a joint income tax return with her husband for 1964. Hereafter petitioners shall refer to Riener C. Nielsen and Gene E. Moffatt.

The partnership of 500 Lucas Building was located in Los Angeles, Calif., and filed timely Forms 1065, U.S. Partnership Return of Income, for the calendar years 1964 and 1965.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended.

The partnership of Riener C. Nielsen and Gene E. Moffatt was located in Los Angeles, Calif., and filed Forms 1065, U.S. Partnership Return of Income, for the taxable years ending 1964 and 1965.

Oak Park Community Hospital, Inc. (Oak Park), a California corporation, was organized on November 8, 1956, for the purpose of conducting a hospital business. From its inception until its dissolution on March 31, 1964, the 7 outstanding shares of Oak Park were held by the following individuals:

|  | Shares |
|---|---|
| Riener C. Nielsen, Los Angeles, Calif. | 1 |
| Gene E. Moffatt, Los Angeles, Calif. | 1 |
| Michael F. LoPresti, North Hollywood, Calif. | 1 |
| L. W. Gaertner, North Hollywood, Calif. | 1 |
| Lloyd Boettger, Stockton, Calif. | 1 |
| Theodore P. Pulas, Stockton, Calif. | 1 |
| John A. Cook, Stockton, Calif. | 1 |
| Total | 7 |

A successful and profitable hospital business was actively conducted by Oak Park in Stockton, Calif., from its organization in 1956 until August 14, 1961, when it acquired an additional hospital in Los Angeles, Calif. Prior to August 14, 1961, South Side Community Hospital, Inc., a corporation, owned and operated a hospital business located in Los Angeles, Calif. The owners of this corporation were not related in any manner to any of the seven individuals who owned the stock of Oak Park.

On August 14, 1961, Oak Park, in a taxable transaction, purchased all the assets and properties, both real and personal, of every kind and character, of South Side Community Hospital, Inc. The assets acquired by Oak Park included the hospital building, furniture, fixtures and equipment therein, stock in trade including drugs, medicine and surgical supplies, goodwill, accounts receivable, books of account, and existing licenses and permits, and the right to conduct the business of operating a hospital in and/or upon the acquired property.

Oak Park's acquisition of these assets was made from its corporate funds and no outside capital was employed. After this purchase, Oak Park Community Hospital, Inc., took over the operation of South Side Community Hospital, Inc., at 7 a.m. on August 15, 1961.

During the 2½-year period, August 15, 1961, to March 31, 1964, Oak Park operated the hospital in Stockton and the hospital in Los Angeles. This operation included the following details:

a. The Stockton hospital primarily served the medical needs of the Stockton region and its patients came mainly from that area,

whereas the Los Angeles hospital served primarily the medical needs of the central Los Angeles region and its patients came mainly from that area.

b. Each hospital had a separate staff of doctors who performed services for patients.

c. The same accounting firm and the same attorney represented Oak Park in all its accounting and legal matters with respect to both hospitals.

d. The same insurance company wrote the hospital malpractice insurance and hospital employee dishonesty insurance policies for both hospitals.

e. Nonperishable food served to patients and employees in both hospitals was obtained from the same institutional supplier; however, no common warehouse or supply of food was maintained for the two hospitals and the food was ordered by the hospital administrator as needed, pursuant to an old contract with the institutional supplier.

f. Oak Park consistently presented financial statements to respective creditors on a consolidated basis without differentiating the Stockton hospital from the Los Angeles hospital; however, separate profit-and-loss statements were prepared monthly for each hospital.

g. Ethel G. George was the administrator of Oak Park and in this capacity she served as the administrator for both the Stockton and the Los Angeles hospitals, commuting between them in order to perform her duties.

h. Patient accounts were maintained at each hospital by employees thereof; also, each hospital maintained subsidiary invoice records relating to its own expenses; however, Ethel G. George supervised the maintenance of the patient accounts at both hospitals and expenditures at each hospital were required to be approved by her.

i. Each hospital maintained a separate commercial bank account; however, only Ethel G. George, as president and secretary-treasurer of Oak Park, had authority to sign checks on these bank accounts; also, Ethel G. George reconciled the bank accounts.

j. Separate profit-and-loss statements were prepared monthly for each hospital. The operations of the Stockton hospital were generally profitable, whereas the operations of the Los Angeles hospital were initially unprofitable. The operations of the Los Angeles hospital thereafter became profitable but substantially less than operations of the Stockton hospital. After the corporate splitup the operation of the Los Angeles hospital again became unprofitable.

k. The board of directors of Oak Park met alternately in the cities of Stockton and Los Angeles from the fall of 1961 until March 31, 1964.

The cities of Los Angeles, Calif., and Stockton, Calif., are 344 miles apart.

During the course of Oak Park's operation of the two hospitals, a dispute arose among the stockholders concerning matters relating to the Los Angeles hospital. In this dispute, Riener C. Nielsen, Gene E. Moffatt, and Michael F. LoPresti maintained one position, while the other four stockholders maintained another. As a result of this dispute, the stockholders agreed to split up the Los Angeles hospital business and the Stockton hospital business into two separate corporations. In order to accomplish this purpose the stockholders of Oak Park negotiated an agreement regarding the splitup. This dispute became bitter and at one point legal action was threatened to resolve it. By a letter dated January 10, 1964, the three dissident shareholders (Riener C. Nielsen, Gene E. Moffatt, and Michael F. LoPresti) offered in effect that they would take the Los Angeles hospital while Lloyd Boettger, Theodore P. Pulas, John A. Cook, and L. W. Gaertner would take the Stockton hospital. Based on this letter offer, an "agreement" regarding splitup (hereinafter referred to as the agreement) was executed by the stockholders of Oak Park.

Pursuant to the agreement two new California corporations were formed, Oak Park Community Hospital, Inc., of Northern California (hereinafter referred to as Oak Park North) and Germ Hospital, Inc. (hereinafter referred to as Germ). Thereafter, Oak Park transferred the assets of the Stockton hospital to Oak Park North in exchange for its stock and transferred the assets related to the Los Angeles hospital to Germ in exchange for all its stock.

On March 31, 1964, pursuant to the agreement, Oak Park Community Hospital, Inc., distributed the stock of Germ Hospital, Inc., pro rata to Riener C. Nielsen, Gene E. Moffatt, and Michael F. LoPresti in return for and respect to their stock in Oak Park. Oak Park controlled Oak Park North and Germ immediately before the distribution described above. At this time Oak Park had owned no assets other than the stock of these two corporations.

After the distributions described above, Oak Park was liquidated.

Immediately after the distributions above, Oak Park North and Germ were each engaged in the conduct of a trade or business within the meaning of section 355 (b) (1) (A) of the Internal Revenue Code of 1954 (the operation of the hospital in Stockton and Los Angeles, respectively).

On March 31, 1964, Oak Park had earned surplus which amounted to $67,520.26 and its capital or paid-in surplus amounted to $37,742.14.

On March 31, 1964, the fair market value of the stock which was received by Riener C. Nielsen and Gene E. Moffatt was $67,937.59 per share. On that date Riener C. Nielsen and Gene E. Moffatt each had a basis of $17,150 in the stock of Oak Park. Therefore, the total basis of the Moffatt-Nielsen partnership was $34,300.

As the Moffatt and Nielsen partnership had an equity value of 2 shares, the fair market value of the stock which was received by the Nielsen and Moffatt partnership was $135,875.18. Accordingly, the long-term gain realized by each partner, Riener C. Nielsen and Gene E. Moffatt, was $50,787.59.

Four of the shareholders of Oak Park, Lloyd Boettger, Theodore P. Pulas, John A. Cook, and L. W. Gaertner, previously litigated the issue of whether the 5-year rule of section 355 was satisfied in the splitup of Oak Park in *Lloyd Boettger*, 51 T.C. 324 (1968). Petitioners, although fellow shareholders in Oak Park prior to the splitup, were not parties in the prior Tax Court case.

Pursuant to section 355 a distribution of the stock of a controlled corporation enjoys tax-free status if the following conditions are met: (1) The distributing corporation distributes stock of corporations of which it has, immediately prior to the distribution, 80-percent control; (2) the distribution is not principally a device for distributing earnings and profits of either the distributing or controlled corporations; (3) the 5-year active business requirements of section 355(b) are satisfied; and (4) the distributing corporation distributes all the stock it has of the controlled corporation. *Albert W. Badanes*, 39 T.C. 410 (1962); *Edmund P. Coady*, 33 T.C. 771 (1960), affd. 289 F. 2d 490 (C.A. 6, 1961).

The only dispute between the parties is whether the distribution of the stock of Germ to petitioners satisfied the 5-year active business requirement of section 355(b).[2] Generally, section 355(b) requires in the

---

[2](b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, or

(B) immediately before the distribution, the distributing corporation had no assets other than stock or securities in the controlled corporations and each of the controlled corporations is engaged immediately after the distribution in the active conduct of a trade or business.

(2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution.

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part, and

(D) control of a corporation which (at the time of acquisition of control) was conducting such trade or business—

(i) was not acquired directly (or through one or more corporations) by another corporation within the period described in subparagraph (B), or

(ii) was so acquired by another corporation within such period, but such control was so acquired only by reason of transactions in which gain or loss was not recognized in whole or in part, or only by reason of such transactions combined with acquisitions before the beginning of such period.

case of a corporate splitup that each of the corporations resulting from the splitup be actively engaged in the conduct of a trade or business immediately after the splitup and that such trade or business have been conducted actively for the 5-year period immediately preceding the splitup. The 5-year period only includes the active conduct of the business by the distributing corporation, by a corporation controlled by the distributing corporation, or by a person from whom the business was acquired by the distributing corporation in a transaction in which gain or loss was not recognized in whole or in part.

Petitioner contends that for more than 5 years preceding the March 31, 1964, distribution Oak Park conducted a single hospital business of which the Los Angeles hospital was a part. It is well established that a corporation engaged in a single business may be divided into two corporations without recognition of gain under section 355 as long as the two resulting corporations continue to engage in the same business carried on by their predecessor. *Edmund P. Coady, supra; United States* v. *Marett*, 325 F. 2d 28 (C.A. 5, 1963) ; Rev. Rul. 64–147, 1964–1 C.B. (Part 1) 136. The 5-year active-business requirement is even satisfied where a corporation expands its business by purchasing assets within the 5-year period preceding the division and these assets become the principal assets of one of the corporations resulting from the division. *Patricia W. Burke*, 42 T.C. 1021 (1964) ; *Lockwood's Estate* v. *Commissioner*, 350 F. 2d 712 (C.A. 8, 1965).

Respondent claims that Oak Park did not conduct a single business as of March 31, 1964, but two distinct hospital businesses of which only one, the Stockton hospital, had the requisite 5-year history. If a corporation engaged in the conduct of two separate businesses, both must have a 5-year history at the time of a corporate division in order to qualify under section 355. *Isabel A. Elliott*, 32 T.C. 283 (1959). After careful consideration of all of the facts in the stipulated record, we are of the opinion that the operations of Stockton and Los Angeles hospitals constituted two separate businesses.[3] Accordingly, the distribution of the stock of Germ to petitioners pursuant to the agreement to split up Oak Park failed to meet the 5-year active-business requirement of section 355(b) because the Los Angeles hospital business was acquired by purchase only 2½ years prior to the distribution.

Although the two hospitals shared the same top management, there was no integration of the income-producing activities of each hospital. The medical staff and patients of each hospital were mutually exclusive. One hospital could hardly be called the branch operation of

---

[3] However, see Emory, "Tax Court Further Narrows Tax-Free Corporate Separations," 47 Taxes 219 (1969), an article discussing the *Boettger* decision.

the other. We think this fact distinguishes the present case from *Patricia W. Burke, supra,* and *Lockwood's Estate* v. *Commissioner, supra,* upon which petitioners rely. Each hospital had the requisite assets and employees for the production of income, and each was a self-sufficient operation. See sec. 1.355–1(c), Income Tax Regs. The things which the hospitals had in common—representation by the same attorneys and accountants and the use of the same insurance company and the same suppliers for some items—might have been shared by any two totally dissimilar businesses owned by one person. Accordingly, we hold that as of March 31, 1964, Oak Park was engaged in the conduct of two separate businesses of which only one, the Stockton Hospital, had been conducted actively for 5 years preceding that date as required by section 355(b).

We have noted that in *Lloyd Boettger, supra,* we also considered the application of section 355 to the splitup of Oak Park with respect to the distributions received by shareholders other than petitioners. Although we have reached the same result that obtained in *Boettger,* we admit that our analysis of section 355 is somewhat different. Irrespective of the rationale of *Boettger,* we believe our analysis of section 355 is well founded on cases like *Patricia W. Burke, supra,* and *Lockwood's Estate* v. *Commissioner, supra.*

In view of the foregoing,

*Decisions will be entered for the respondent.*