HARRY B. ATLEE AND COLLEEN ATLEE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4222–73. Filed December 8, 1976.

*James F. Davis* and *Keith T. Childers,* for the petitioners. *Robert E. Glanville,* for the respondent.

WILBUR, *Judge:* Respondent has determined deficiencies in petitioners' Federal income taxes for the years 1969 and 1970 in the amounts of $1,371.45 and $31,107.51, respectively. The issues presented for decision are: (1) Whether petitioners effected a tax-free corporate division under section 355,[1] and (2) the fair market value of the stock of Atlee Enterprises, Inc., on the date such stock was distributed to petitioners.[2]

### FINDINGS OF FACT

Most of the facts have been stipulated and are found accordingly.

Petitioners Harry B. and Colleen Atlee, husband and wife, filed joint Federal income tax returns for the years in issue with the Internal Revenue Service Center at Austin, Tex. They were residents of Oklahoma City, Okla., at the time their petition was filed with this Court.

Prior to July of 1952, petitioners owned and operated a milk purchasing, processing, and distributing business in Oklahoma City, which was incorporated as Hansen & Atlee Dairy, Inc., on July 2, 1952. From the time of its incorporation until December 31, 1969, Hansen & Atlee Dairy, Inc., later known as Hansen-Atlee Co., had authorized and outstanding 320 shares of its only class of capital stock, held as follows:

| | Shares | | Shares |
|---|---|---|---|
| Colleen Atlee | 159 | Evelyn S. Hansen | 159 |
| Harry B. Atlee | 1 | Leonard M. Hansen | 1 |
| | | Total | 320 |

On or about April 1, 1959, Hansen & Atlee Dairy, Inc., sold the milk purchasing, processing, and distributing business it had previously operated to Gold Spot Dairy, Inc. Subsequent to this sale, Hansen & Atlee Dairy, Inc., began to acquire

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise stated.

[2] Respondent has determined that petitioners realized gain on the sale of certain real property in 1969 in the amount of $2,738.21 rather than $2,500 as reported on petitioners' 1969 Federal income tax return. Petitioners have offered no evidence on this issue, nor have they argued it on brief. We have therefore concluded that petitioners have conceded the issue.

certain undeveloped land in the Oklahoma City area.[3] On October 8, 1959, the corporate charter of Hansen & Atlee Dairy, Inc., was amended to change the name to Hansen-Atlee Co. (Hansen-Atlee), reflecting the fact that the corporation was no longer engaged in the dairy business, and to add the following corporate purposes and powers;

"to buy, acquire, trade, sub-divide or deal in real estate located in incorporated cities and towns and in additions thereto";—"to construct, repair and maintain buildings and other improvements thereon and to rent the same and collect and invest the income therefrom"; and—"to acquire, own, hold, sell and dispose of notes and mortgages and other securities and evidences of debts."

Hansen-Atlee continued to purchase land with a view to erecting thereon commercial or residential developments that would be held for use in the business of renting. The general pattern of development for these properties was to have Hansen-Atlee act as its own general contractor, and subcontract certain special tasks, such as electrical work, plumbing, and bricklaying. The properties purchased and developed by Hansen-Atlee, however, were relatively few in number.

The major asset of Hansen-Atlee was two apartment complexes, known collectively as the "Country Club Apartments."[4] In March of 1962, Hansen-Atlee acquired the three tracts of land at 5700 South Agnew in Oklahoma City on which these apartments were built. The complex consisted of 144 apartment units, and was constructed by Hansen-Atlee acting as its own general contractor and planner. The total construction cost of these apartments was $847,811.79, as reported on the tax return filed by Hansen-Atlee Co. for its fiscal year ended June 30, 1965. From the time the apartments were built, Hansen-Atlee Co. actively managed the complexes, doing its own painting, recarpeting, and redecorating work, as well as making major changes in the original air-conditioning and plumbing systems.

---

[3] On Sept. 23, 1959, Hansen & Atlee Dairy, Inc., acquired two undeveloped parcels of land at 7610 and 7612 North Western in Oklahoma City, at a total cost of $42,270.42. Three days later the company acquired an option to purchase undeveloped land on South Pennsylvania in Oklahoma City.

[4] The Country Club Apartments were operated as a single unit and the utility lines were hooked together.

In midsummer of 1969, petitioners and Leonard M. and Evelyn S. Hansen began to formulate a plan to divide the corporate business between the Atlee shareholders and the Hansen shareholders, at the urging of petitioners. Harry B. Atlee desired to divide the corporate business so that his son, who was about to become available after service in the Navy, could join him in the business. There had previously been a longstanding agreement against the corporation's hiring relatives of the four shareholders. Furthermore, Leonard M. Hansen's involvement in motel operations outside Hansen-Atlee Co. had destroyed the earlier close business and personal relationship between Mr. Hansen and Mr. Atlee, and had left the primary burden of management of Hansen-Atlee Co. on petitioner Harry B. Atlee.

On December 31, 1969, a document entitled "Plan of Reorganization of Hansen-Atlee Company" (hereinafter the plan) was executed by petitioners and the Hansens. Pursuant to the plan Atlee Enterprises, Inc., was formed on December 31, 1969. In exchange for all of the capital stock of Atlee Enterprises, Inc., Hansen-Atlee Co. transferred $500 in cash plus the following property to the new corporation: the Choctaw property, the Eufaula property, the South Youngs property, the Gentry-Rogers note, the first Burke note, the second Burke note, the Dairy Boy leasehold interest, one 1968 Chevrolet Caprice, one 1961 Airstream House Trailer.[5] Atlee Enterprises, Inc., also assumed liability to pay a $21,865.26 note made by Hansen-Atlee Co. All 160 shares of stock of Hansen-Atlee Co. owned by petitioners were transferred to Hansen-Atlee in exchange for all the stock of Atlee Enterprises, Inc., on or about January 2, 1970.

The Choctaw property consisted of 80 acres of unimproved land on Northeast 10th Street in Oklahoma County. Sometime after acquisition, preliminary plans were drawn by a surveying company to cut the property into lots, but except for the clearing of underbrush on about 10 acres, no development had occurred prior to the end of 1969. This property had been acquired by Evelyn S. Hansen and Harry

---

[5] The principal assets remaining in Hansen-Atlee Co. were the Country Club Apartments, the buildings at 1601 Exchange acquired in 1954 with subsequent improvements, and property at Park and Western in Oklahoma City. The land at Park and Western along with three houses on the property was acquired in May of 1962 for $23,000.

B. Atlee in their individual capacities on September 22, 1960. The property was subsequently conveyed to Hansen-Atlee by warranty deed, dated December 23, 1969.

The Eufaula property consisted of 63.21 unimproved acres. The property had been purchased for $14,000 in February 1969 at an auction sponsored by the Bureau of Indian Affairs. The title to the Eufaula property had originally been taken by Leonard M. Hansen and Harry B. Atlee, individually, although most of the purchase price had been paid by Hansen-Atlee Corp. The property was transferred to the Hansen-Atlee Corp. on December 23, 1969.

The South Youngs property was a 260- × 260-foot lot in Oklahoma City. When purchased in 1962 (either by the petitioners and the Hansens or the Hansen-Atlee Corp.), the lot contained a three-bedroom frame house which burned sometime before December 31, 1969, at which time it was unimproved. There were architectural plans, however, for a 46-unit apartment complex to be built on the property.

The Gentry-Rogers note was initially payable to and held by Colleen Atlee and Evelyn S. Hansen. On December 23, 1969, they negotiated this note to Hansen-Atlee Co. The note arose as the result of a sale in October 1969 of the Rockwell-Gault property. The Rockwell-Gault property had been previously acquired by petitioners and the Hansens in late 1968 for $50,000. The property was then sold by them in October 1969 for $100,000. There was a $10,000 downpayment and the Gentry-Rogers note represented the $90,000 balance. The principal balance of this note to Hansen-Atlee Co. was $88,898.85 on December 31, 1969, subject to a first mortgage on the property having a principal balance of $39,263.13,[6] leaving a net principal receivable under this note of $49,635.72 on December 31, 1969.

The first Burke note was the result of a sale by Hansen & Atlee Co. of its properties located at 7610 and 7612 North Western in Oklahoma City. The properties had been acquired by Hansen & Atlee Co. in 1959 as vacant land. During 1961, Hansen-Atlee, acting as its own general contractor, con-

---

[6] The first mortgage note represented the remaining debt owed by the Hansens and the Atlees when they originally purchased the property. The face amount of this note was $40,000 and it bore a 6-percent interest rate. The interest rate on the Gentry-Rogers note was also 6 percent per annum. The principal and interest on the Gentry-Rogers note were amortized over a 10-year period.

structed a shopping center consisting of a 7-Eleven grocery store as its major tenant and five other shop or office spaces. The construction cost Hansen-Atlee $102,951.05. On October 1, 1968, Hansen-Atlee sold its shopping center to Bennet A. and Jacquelyn F. Burke for the sum of $135,000, $17,122.64 of which was received in the taxable year of sale and the balance payable pursuant to an installment note. The principal balance on this note on December 31, 1969, was $116,399.25, but was subject to a first mortgage note having a principal balance of $34,559.53[7] on that date, leaving a net principal receivable under the note of $81,839.72.[8] From its construction until its sale, the shopping center at 7610 and 7612 North Western was actively managed by Hansen-Atlee, and required frequent remodeling to suit the varying needs of its changing tenants.

In December of 1969, Hansen-Atlee sold its remaining land at the 7600 block of North Western to the Burkes. Hansen-Atlee received $85,041.04 for the property of which $920.62 was received in the taxable year of sale, with the remainder to be paid pursuant to the second Burke note. The second Burke note was subject to a first mortgage note[9] on the property having a principal balance of $15,041.04 leaving a net principal balance renewable under this note of $70,000 on December 31, 1969.[10]

The Dairy Boy leasehold interest was the interest of Hansen-Atlee with respect to a lease dated December 27, 1958, from Helen E. Morgan and Cora May L. Marshall as lessors to Dairy Boy, Inc., a corporation controlled by the Hansens and the Atlees, as lessees. The lease was for a period

---

[7] The first mortgage note was payable to the Local Federal Savings & Loan of Oklahoma City, and carried with it an interest rate of 6 percent per annum. The interest rate on the first Burke note was 7 percent per annum. Principal and interest were amortized over a 20-year period.

[8] Payments on the first Burke note became increasingly delinquent after 1970, sometimes being as much as 11 months overdue. At one point, the third mortgagee began foreclosure proceedings and petitioner had the tenants make their rental payments directly to petitioners, who first applied these sums to the first mortgage to protect their equity interest.

[9] The first mortgage note was payable to one Wilma Barney and had a 6-percent interest rate. The second Burke note was a 20-year note carrying an interest rate of 6 percent.

[10] The second Burke note was consistently delinquent and the property was in the process of being foreclosed at the time of trial.

of 5 years with options to renew for two additional 5-year periods. The second of these renewal periods ran from April 1, 1969, to March 31, 1974. The monthly rental due Mrs. Morgan and Mrs. Marshall during this time was $110. The property was subleased to a third party for $250 per month, as of January 2, 1970. Dairy Boy, Inc., had assigned its interest under the lease to H.A.S., Inc., another corporation controlled by the Atlees and the Hansens, on March 12, 1959. Finally, on December 23, 1969, H.A.S., Inc., assigned the lease to Hansen-Atlee.

The 1961 Airstream mobile home trailer and the 1968 Chevrolet Caprice automobile transferred to Atlee Enterprises, Inc., together had a fair market value of $4,034 on December 31, 1969.

After the corporate division, Atlee Enterprises, Inc., proceeded with the development of the properties received in the division, as well as other properties subsequently acquired.

In January 1970 Atlee Enterprises acquired land at Northwest 10th and Peniel in Oklahoma City.[11] During the next few months, Atlee Enterprises, acting as its own general contractor, began construction of a 7-Eleven store and four other spaces for commercial rental. The construction was completed in time to receive rental in July of 1970. Atlee Enterprises also constructed 36 Tiny Warehouse (small individual storage) spaces on the property in 1972.

By late 1970, Atlee Enterprises had also begun work on the Choctaw property. The corporation purchased a bulldozer motor grader and tractor and proceeded to divide the property

---

[11] Prior to Dec. 31, 1969, petitioners had sold this real estate to one Mr. Miller under contract for deed, so that title of record to the property remained in the names of petitioners. In the fall of 1969 a representative of 7-Eleven Stores approached petitioner Harry B. Atlee offering to lease from him a store building on the Northwest 10th and Peniel property, to be built by petitioners. Verbal agreements were made before the end of 1969 to reacquire the Northwest 10th and Peniel property from Mr. Miller, and subject to demands on petitioner Harry B. Atlee's time caused by the terminal illness of his brother, to build the desired store and lease it to 7-Eleven. On Jan. 15, 1970, petitioners conferred with their attorney with regard to acquiring the Northwest 10th and Peniel property in the corporate entity Atlee Enterprises, Inc. However, since title of record to the property was then in the names of the petitioners individually, the contract for deed was canceled and the title of record to the Northwest 10th and Peniel property was conveyed from petitioners as individuals to Atlee Enterprises, Inc., by warranty deed dated Jan. 28, 1970.

into 5-acre tracts by clearing and moving timber and graveling roads. Outside contractors with heavier equipment had to be hired to build the ditches, set three 40-foot tinhorns, and haul in gravel for the roads. Work on the Choctaw property was completed in July or August of 1971. The sixteen 5-acre tracts comprising this property were eventually sold in 1971 and 1972 for approximately $6,000 to $6,500 apiece.

After completion of work on the Choctaw property in late 1971, Atlee Enterprises moved its house trailer and earthmoving equipment to the Eufaula property, to begin development of this property into individual tracts. By the time of the trial, Atlee Enterprises had approximately 39 lot sites developed, some of which have been sold. A substantial amount of the original acreage remains for further development.

In 1973, Atlee Enterprises, Inc., acquired real estate in the 7200 block of West Reno in Oklahoma City, on which, acting as its own general contractor, it built 542 Tiny Warehouse rental units, 16 offices, and 2 apartments above the offices for its employees who manage and maintain the rental units and offices.

In addition to Atlee Enterprises' acquisition and construction activities, petitioners transferred to the corporation a number of developed properties which had previously been held in their individual names.[12]

From January 1, 1970, to the date of the trial, Hansen-Atlee Co., now Hansen & Co., has continued in the rental and development business. Shortly after the corporate division, the Country Club Apartments were divided into separate complexes, one of 53 units and one of 91 units, by rerunning the utility lines into each complex. There are now separate mortgages on each property. In addition to operating the Country Club Apartments, Hansen & Co. has been developing its property at Park and Western and performing extensive remodeling upon its property at 1601 Exchange Avenue.

## OPINION

Petitioners and the Hansens each owned 50 percent of the stock of Hansen-Atlee Corp. on December 31, 1969. On that

---

[12] The bulk of these transfers took place in 1970 and 1971.

date Hansen-Atlee Corp. adopted a plan of reorganization. Pursuant to the plan, Atlee Enterprises, Inc., was formed on December 31, 1969, and some of the assets of Hansen-Atlee (along with $500 in cash) were transferred to Atlee Enterprises, Inc., in return for all of its stock. On January 2, 1970, petitioners transferred all of their stock in Hansen-Atlee Corp. to Hansen-Atlee in exchange for all the shares of Atlee Enterprises, Inc.

The primary issue presented for our decision is whether the distribution by Hansen-Atlee of all of the stock of its wholly owned subsidiary, Atlee Enterprises, Inc., and the surrender by petitioners of all of their stock in Hansen-Atlee qualified as a nontaxable corporate division under section 355. If we find that the distribution is taxable, then we must also determine the fair market value of the Atlee Enterprises' stock on the date of distribution in order to establish the gain properly recognizable on the transaction.

Section 355(b)(1) requires, inter alia, that the distributing corporation *and* the controlled corporation be engaged in the active conduct of a trade or business immediately after the distribution.[13] Furthermore, section 355(b)(2) provides that each corporation is regarded as being engaged in a trade or business only if "such trade or business was actively conducted throughout the 5-year period ending on the date of the distribution."[14]

---

[13] SEC. 355. DISTRIBUTION OF STOCK AND SECURITIES OF A CONTROLLED CORPORATION.

(b) REQUIREMENTS AS TO ACTIVE BUSINESS.—

(1) IN GENERAL.—Subsection (a) shall apply only if either—

(A) the distributing corporation, and the controlled corporation (or, if stock of more than one controlled corporation is distributed, each of such corporations), is engaged immediately after the distribution in the active conduct of a trade or business, * * *
* * *

(2) DEFINITION.—For purposes of paragraph (1), a corporation shall be treated as engaged in the active conduct of a trade or business if and only if—

(A) it is engaged in the active conduct of a trade or business, or substantially all of its assets consist of stock and securities of a corporation controlled by it (immediately after the distribution) which is so engaged,

(B) such trade or business has been actively conducted throughout the 5-year period ending on the date of the distribution,

(C) such trade or business was not acquired within the period described in subparagraph (B) in a transaction in which gain or loss was recognized in whole or in part * * *

[14] Sec. 355(b)(2).

Thus section 355 is applicable to this case if and only if the Hansen-Atlee Corp. transferred a trade or business to Atlee Enterprises, Inc., that Hansen-Atlee actively conducted throughout the 5-year period ending on January 2, 1970. As the parties recognize, this requires us, on the facts of this case, to focus on the assets transferred to Atlee Enterprises, Inc., and their functional relationship to the assets retained by Hansen-Atlee, Inc.

Petitioners contend that the business of Hansen-Atlee was at all times a single business, which was divided vertically into mirror images by the corporate division, citing *Edmund P. Coady,* 33 T.C. 771 (1960), affd. 289 F.2d 490 (6th Cir. 1961).[15] Petitioners allege that the components of this single business—property development and property management—both generated the income realized. They conclude that each of the divided parts was a functional component of the entire business as conducted during the 5 years prior to the division, and that the parts in themselves each constituted a trade or business after the division.[16]

---

The 5-year aging requirement was added in 1954. The report of the Senate Finance Committee noted then:

"Present law contemplates that a tax-free separation shall involve only the separation of assets attributable to the carrying on of an active business. Under the House bill, it is immaterial whether the assets are those used in an active business but if investment assets, for example, are separated into a new corporation, any amount received in respect of such an inactive corporation, whether by a distribution from it or by a sale of its stock, would be treated as ordinary income for a period of 10 years from the date of its creation. Your committee returns to existing law in not permitting the tax free separation of an existing corporation into active and inactive entities. It is not believed that the business need for this kind of transaction is sufficiently great to permit a person in a position to afford a 10-year delay in receiving income to do so at capital gain rather than dividend rates. Your committee requires that both the business retained by the distributing company and the business of the corporation the stock of which is distributed must have been actively conducted for the 5 years preceding the distribution, a safeguard against avoidance not contained in existing law. [S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 50–51 (1954).]"

[15] The Service originally took the position that sec. 355 did not apply to the division of a single business. We rejected this view in *Edmund P. Coady,* 33 T.C. 771 (1960), affd. 289 F.2d 490 (6th Cir. 1961). Two years after *Coady* was affirmed, the Fifth Circuit also held that a single business could be divided under sec. 355. *United States v. Marett,* 325 F.2d 28 (5th Cir. 1963). The Service subsequently conceded the issue in Rev. Rul. 64–147, 1964–1 C.B. (Part 1) 136.

[16] If a single business is divided, then the two resulting corporations share the business history of the original corporation for purposes of the 5-year rule. Prior to *Coady,* the Service took the position that a single business could not be divided under sec. 355, and the taxpayer generally argued that there were two separately identifiable businesses. After *Coady,* the positions of the parties were often reversed;

Respondent does not deny that Hansen-Atlee conducted a single trade or business, but contends that this unitary business remained with Hansen-Atlee after the "division," minus a couple of nonessential liquid assets. He contends that the additional assets transferred were passed from the Hansens and Atlees individually to Atlee Enterprises, Inc., with Hansen-Atlee serving as a mere conduit, and that in substance the transaction involved an exchange of the Atlees' stock interest in Hansen-Atlee Co. for property interests owned by the Hansens. Moreover, respondent contends that even if Hansen-Atlee is not treated as a mere conduit, the record fails to show that petitioners and the Hansens (or H.A.S., Inc., in the case of the Dairy Boy lease) held the assets in an active trade or business for a period of time which, when coupled with the period the assets were held by Hansen-Atlee Co., totaled the 5-year period contemplated by section 355.[17]

We agree with respondent. The only Hansen-Atlee assets the corporation owned on December 22, a few days before the plan of reorganization was adopted, that ended up in Atlee Enterprises, Inc., were two notes receivable (the two Burke notes), and a used car and travel trailer. Thus, focusing on the two corporations specified in the language of section 355, we see that Hansen-Atlee retained virtually all of the operating assets the corporation used in its business.

To compensate for this large disparity, the Hansens relinquished their interest in the assets held individually with the Atlees or owned with them through another corporation. On December 23, 1970, the Choctaw and Eufaula properties, along with the Gentry-Rogers note, were transferred to Hansen-Atlee by petitioners and the Atlees, along with some additional real estate bearing some relationship to the South Youngs property.[18] Also on December 23, 1969, the Dairy Boy

---

the taxpayer arguing for a single business with a shared business history, and the Service attacking the division on the grounds there were two businesses, one of which was not sufficiently aged. For a discussion on some of the litigation on this issue, see Emory, "Tax Court Further Narrows Tax-Free Corporate Separations," 47 Taxes 219 (1969).

[17] If the distributing corporation acquires a business in a tax-free acquisition, the period during which this business was actively conducted by the predecessor may generally be used in determining whether the 5-year requirement has been met. *W.E. Gabriel Fabrication Co.*, 42 T.C. 545 (1964); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 50–51 (1954).

[18] The parties left the record in a state of confusion as to how Hansen-Atlee

lease was transferred to Hansen-Atlee by H.A.S., Inc., a corporation apparently controlled by petitioners and the Hansens. A little over a week later, these assets were transferred pursuant to the reorganization plan to Atlee Enterprises, Inc.

The only assets that we can clearly identify as emerging from the assets constituting the "unitary trade or business" of Hansen-Atlee are the two Burke notes, the used Airstream travel trailer, and the used car. As the Ninth Circuit stated in similar circumstances, "without lawyers and tax laws, we believe it fair to say" that the Hansens would simply have signed over their interest in the property individually owned in exchange for acquiring the lion's share (or all of the operating assets) of the Hansen-Atlee Corp. *Portland Mfg. Co. v. Commissioner*, 35 AFTR 75–1439, 75–1 USTC par. 9449 (9th Cir. 1975), affg. without published opinion 56 T.C. 58 (1971). Instead these assets were run quickly through the corporation "in a matter of days, never pausing long enough to serve any business purpose, until they reached their ultimate destination." *Portland Manufacturing Co.*, 56 T.C. 58, 77 (1971). This transitory step was wholly unrelated to the business of the Hansen-Atlee Corp.; the corporation was merely the medium or broker through which payment was made by the Hansens for the value of the Atlees' interest in the operating assets of the Hansen-Atlee Corp. in excess of the two Burke notes (and the trailer and car).

We are not here confronted with asset acquisitions within the critical 5-year period that raise issues of horizontal or vertical expansion of the divided corporation's business or the problem of whether one or more trades or businesses were conducted. See Conf. Rept. No. 2543, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 38 (1954); *Riener C. Nielsen*, 61 T.C. 311 (1973); *Patricia W. Burke*, 42 T.C. 1021 (1964); *Lockwood's Estate v. Commissioner*, 350 F.2d 712 (8th

---

acquired the South Youngs property. They stipulated a deed transferring property to Hansen-Atlee on Dec. 23, 1969. The stipulation does not specifically identify the deed with the South Youngs property. Nevertheless, respondent understood the deed to involve the South Youngs property. The legal description of the deed in issue appears to identify property very close to (possibly contiguous to), but different from the South Youngs property described in the plan of reorganization. In view of the status of the record that the briefs (particularly the requested findings) do nothing to clarify, we can conclude only that the deed involved property that was part of the overall property settlement between the Hansens and the Atlees.

Cir. 1965). Neither is this a situation where the same trade or business was actively conducted by the distributing corporation after acquisition from a related entity or individual(s), who also actively conducted the trade or business for a period of time, the two periods totaling 5 years or more. See sec. 355(b)(2)(C). Rather we have here simply a collection of unrelated assets never functionally integrated in any business activity, having nothing particular in common save their ownership by the same parties who owned the corporate conduit.

Section 355 provides a set of quite specific rules. They are designed to defer taxation of gain on stock exchanges shifting ownership from one-half of all to all of one-half of an active corporate business enterprise. The section was not designed to encompass the division of all property individuals may own in any form, corporate or individual. See sec. 1.355–3(a), Income Tax Regs. It may be argued that equity requires the situations to be treated similarly. But in this instance Congress has carefully worked out detailed rules on the basis of trial and error for four decades.[19] The statute is tightly drawn to avoid abuses that experience produced. We have no difficulty perceiving that it may not be stretched, no matter how much we abhor legalistic interpretations, to encompass the circumstances before us.

Having concluded that the surrender by petitioners of their Hansen-Atlee stock in return for all of the stock in Atlee Enterprises constituted a taxable event, we must now determine the fair market value of the Atlee Enterprises stock on the date of distribution in order to establish petitioners' gain on the transaction.

In determining the value of this particular stock, the parties have agreed it is appropriate to value and total the underlying assets of the corporation. Using this approach, respondent has valued the Atlee Enterprises stock on the date

---

[19] The spinoff provision provided for in the Revenue Act of 1924, sec. 203(c), 43 Stat. 256 (1924), was repealed by the Revenue Act of 1934. Tax-free spinoffs were reinstated in 1951, with some statutory restrictions. Sec. 112(b)(11), I.R.C. 1939. The provisions relating to the tax treatment of corporate divisions were substantially revised when reenacted into the Internal Revenue Code of 1954, sec. 355. See discussion in Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 13.02 (3d ed. 1971).

of distribution at $208,009.92. Petitioners, while not suggest-
ing a specific figure, argue that the value of the Atlee
Enterprises stock was substantially less than that determined
by respondent. The values placed on specific assets by the two
parties may be summarized as follows:

| Asset | Respondent's value | Petitioners' value |
|---|---|---|
| Mobile trailer and automobile | $4,034.00 | $4,034 |
| Leasehold interest | 6,000.00 | No value given |
| Eufaula property | [1]15,000.00 | 15,000 |
| Choctaw property | [1]11,000.00 | 11,000 |
| South Youngs property | [1]15,000.00 | 15,000 |
| Gentry-Rogers note | [2]49,635.72 | 25,000 to 35,000 |
| Burke note No. 2 | [3]70,000.00 | 35,000 |
| Burke note No. 1 | [3]75,173.16 | 10,000 to 15,000 |

[1] At least.
[2] Principal balance.
[3] Principal balance was $81,839.72.

The parties agree that the value of the mobile trailer and
used automobile is $4,034 and we so find. Respondent
determined the value of the leasehold by reasoning that on
the date of the corporate division, the leasehold interest had a
remaining term of approximately 50 months at $110 per
month, and that Atlee Enterprises, Inc., sublet the property
for $250 per month, resulting in a net gain each month of
$140. Projected out over the term of the lease, the resulting
total gain would be $7,000. After discounting this amount, the
fair market value of the leasehold reached by respondent was
$6,000. We believe that respondent's figure was insufficiently
discounted with respect to time, and did not take into account
any risk element. Accordingly, we find the value of the
leasehold to be $5,500.

Respondent does not seriously contest petitioners' valuation
of the Eufaula, Choctaw, and South Youngs properties except
to argue that 15 acres of Choctaw property was sold for
$24,000 during the fiscal year ending September 30, 1971, and
that sixteen 5-acre tracts of Choctaw property were sold in
later years for $96,000.[20] We note, however, that substantial
development activity took place with respect to the Choctaw

---

[20] These two events assume that 96 acres in all were sold. Curiously, both parties
have stipulated that the Choctaw property only consisted of 80 acres.

property after its transfer to Atlee Enterprises, and that the later sales price of the property does not reflect significantly on its value at the distribution date. We therefore find that the values of the Eufaula, Choctaw, and South Youngs properties are $15,000, $11,000, and $15,000 respectively.

The heart of the stock valuation controversy is the valuation of the three second mortgage notes. Respondent valued the Gentry-Rogers note and the second Burke note at their net principal balances. The first Burke note was discounted to a factor of 86.735 of the net principal balance, resulting in a valuation of $75,173.16 for the note. At trial, petitioner called an expert witness, Jim L. Hurley,[21] who testified that the second mortgage notes, against the general factual backgrounds present here, should be given values substantially less than their face values. Respondent did not call any expert witnesses, nor did he present any alternative valuation for the notes beyond the discount given to the second Burke note.

We note at the outset that second mortgage notes represent, in the absence of high rates of return, an unattractive investment for a potential purchaser. Because of their inherent risk, they are highly speculative and not readily salable on the open market. If the promisor defaults on the note, not only does the holder have to make the first mortgage payments to protect his investment, but he may frequently have to invest additional sums to develop or improve the underlying property in order to attract buyers.

Two of the three notes in issue carry an interest rate of only 6 percent, and the third only 7 percent, rates far below the substantial returns that could be expected for this type of investment. We believe that the lack of liquidity of these notes, their substantial risk, and their low rate of interest all act to substantially depress their fair market value.

An especially important element in valuing these notes is an appraisal of the property that secured them. The Gentry-Rogers note arose as the result of a sale of the Rockwell-Gault property in October 1969 for $100,000, of which $10,000 was

---

[21] At the time of trial Mr. Hurley was president of a real estate investment trust in Oklahoma City. He had previously been self-employed as a real estate developer and builder, and had also been a bank vice president in its real estate loan department.

in cash, and a wraparound mortgage and note[22] for $90,000. Hansen-Atlee had purchased this property less than a year earlier for $50,000. We note that even at $100,000 the loan-to-value ratio is very high. This 90-percent loan-to-value ratio further operates to increase the risk to the holder of the second mortgage. Taking into account all of these circumstances surrounding the Gentry-Rogers note, we find its value at the date of distribution to be $35,000.

An examination of the property securing the second Burke note likewise suggests a lower value for the second mortgage note. Hansen-Atlee received $85,041.04 for this property, all of which sum is reflected in the second Burke note. Mr. Hurley's testimony established that the property in question was poorly located for potential development. Moreover, he noted the topography of the land is such that it would likely require substantial preliminary development before anything could be constructed on the property. These negative factors have an adverse impact on the value of the second mortgage note. Taking into account the additional factors affecting the value of second mortgage notes previously discussed, we find that the value of the second Burke note on the date of distribution was also $35,000.

The first Burke note was secured by improved property on which there was a small shopping center. This shopping center had been constructed by Hansen-Atlee in 1961 and consisted of a 7-Eleven grocery store as its major tenant and five other shop or office spaces. The property was sold for $135,000 with $15,000 in cash, and a second mortgage for $120,000 which was wrapped around the first mortgage. Petitioners attempted to show a minimal value for the second mortgage note by arguing that the rent after expenses barely covered debt service on the first mortgage, and left little to pay the second mortgage. Unfortunately, none of the figures which might establish petitioners' position were submitted into evidence, and therefore cannot be considered. After carefully reviewing all of the evidence in the record with respect to the first Burke note, we find that its value at the date of distribution was $40,000.

---

[22] All three of the notes in question are wraparound notes. The wraparound note includes the amount owing on the first mortgage, but they are essentially second mortgage notes and may from time to time be referred to as such.

In establishing a value for the notes in issue, we have taken into account the fact that the second note and mortgage were, by virtue of an assignment, with full recourse against a solvent corporation. We also note in this connection, however, that this recourse is not a complete guarantee against loss. While the corporation may be solvent at the time of its guarantee, a number of unexpected financial reverses could occur in the 10- or 20-year term of the note. This is especially true in such a high risk business like real estate. Moreover, the holder of a defaulted second mortgage note may have some litigation risks to insure his guarantee.

In sum, we find that the value of Atlee Enterprises, Inc., stock (after also accounting for the $21,865.26 note assumed by Atlee Enterprises, Inc.), on the date of distribution was $139,168.74.

*Decision will be entered under Rule 155.*